# LOCAL 1976, UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, A. F. L., ET AL. *v.* NATIONAL LABOR RELATIONS BOARD.

No. 127. Argued March 12, 1958.—Decided June 16, 1958.*

*Arthur Garrett* argued the cause for petitioners in No. 127. With him on the brief was *John C. Stevenson.*

*Dominick L. Manoli* argued the causes for the National Labor Relations Board. With him on the briefs were

---

*Together with No. 273, *National Labor Relations Board* v. *General Drivers, Chauffeurs, Warehousemen and Helpers Union, Local No. 886, AFL–CIO,* and No. 324, *Local 850, International Association of Machinists, AFL–CIO,* v. *National Labor Relations Board,* both on certiorari to the United States Court of Appeals for the District of Columbia Circuit, argued March 11–12, 1958.

*Solicitor General Rankin, Jerome D. Fenton* and *Norton J. Come.* With them on the briefs also were *Thomas J. McDermott* in No. 127 and *Stephen Leonard* in Nos. 273 and 324.

*Louis P. Poulton* argued the cause for petitioner in No. 324. With him on the brief were *Plato E. Papps* and *George W. Christensen.*

*Herbert S. Thatcher* argued the cause for respondent in No. 273. With him on the brief were *David Previant* and *L. N. D. Wells, Jr.*

*Peter T. Beardsley* and *Gerard D. Reilly* filed a brief for the American Trucking Associations, Inc., as *amicus curiae,* urging reversal in No. 273 and affirmance in No. 324.

*William B. Barton* filed a brief for the Chamber of Commerce of the United States, as *amicus curiae,* in Nos. 273 and 324.

*J. Albert Woll, Thomas E. Harris* and *Joseph M. Stone* filed a brief for the American Federation of Labor and Congress of Industrial Organizations, as *amicus curiae,* in Nos. 127, 273 and 324.

MR. JUSTICE FRANKFURTER delivered the opinion of the Court.

These cases involve so-called "hot cargo" provisions in collective bargaining agreements. More particularly, they raise the question whether such a provision is a defense to a charge against a union of an unfair labor practice under § 8 (b)(4)(A) of the National Labor Relations Act, as amended, 61 Stat. 136, 141, 29 U. S. C. § 158 (b)(4)(A).

No. 127 arises out of a labor dispute between carpenter unions and an employer engaged in the building construction trade in Southern California. The Sand Door

and Plywood Company is the exclusive distributor in Southern California of doors manufactured by the Paine Lumber Company of Oshkosh, Wisconsin. Watson and Dreps are millwork contractors who purchase doors from Sand. Havstad and Jensen are general contractors who were, at the time of the dispute involved, engaged in the construction of a hospital in Los Angeles. Havstad and Jensen are parties to a master labor agreement negotiated with the United Brotherhood of Carpenters and Joiners of America on behalf of its affiliated district councils and locals, including petitioner unions. This agreement, comprehensively regulating the labor relations of Havstad and Jensen and its carpenter employees, includes a provision that, "workmen shall not be required to handle non-union material."

In August 1954 doors manufactured by Paine and purchased by Sand were delivered to the hospital construction site by Watson and Dreps. On the morning of August 17, Fleisher, business agent of petitioner Local 1976, came to the construction site and notified Steinert, Havstad and Jensen's foreman, that the doors were non-union and could not be hung. Steinert therefore ordered employees to cease handling the doors. When Nicholson, Havstad and Jensen's general superintendent, appeared on the job and asked Fleisher why the workers had been prevented from handling the doors, he stated that they had been stopped until it could be determined whether the doors were union or nonunion. Subsequent negotiations between officers of Sand and the union failed to produce an agreement that would permit the doors to be installed.

On the basis of charges filed by Sand and a complaint duly issued, the National Labor Relations Board found that petitioners had induced and encouraged employees to engage in a strike or concerted refusal to handle Paine's doors in order to force Havstad and Jensen and

Sand to cease doing business with Paine, all in violation of § 8 (b)(4)(A). 113 N. L. R. B. 1210. The Court of Appeals for the Ninth Circuit enforced the Board's cease-and-desist order, 241 F. 2d 147, and we granted certiorari. 355 U. S. 808. The sole question tendered by the petition for certiorari concerned the relation between the hot cargo provision in the collective bargaining agreement and the charge of an unfair labor practice proscribed by § 8 (b)(4)(A).[1]

Nos. 273 and 324 arise out of a labor dispute in Oklahoma City in which certain unions are said to have induced the employees of five common carriers to cease handling the goods of another employer in violation of § 8 (b)(4)(A). American Iron and Machine Works was engaged in a controversy with Local 850 of the International Association of Machinists, the bargaining representative of its production and maintenance employees, and a strike had been called at the company's plants. Picketing at the plants prevented the carriers that normally served American Iron from making pickup and deliveries, so American Iron hauled freight in its own trucks to the loading platforms of the carriers. The Machinists followed the trucks to the carriers' platforms and picketed them there, without making it clear that their dispute was only with American Iron. In addition, there was evidence that they expressly requested

---

[1] We therefore find it unnecessary to consider other contentions now made by petitioners on issues resolved against them by both the Board and the Court of Appeals: (1) Whether Steinert, when he instructed the employees to stop handling the doors, acted as a representative of Havstad and Jensen, the employer, or in his capacity as a member of the union, bound to enforce its rules. (2) Whether there was substantial evidence to support the Board's conclusion that the union conduct was not primary activity outside the scope of § 8 (b)(4)(A). See *Irvine* v. *California*, 347 U. S. 128, 129–130; Rule 23 (c) of the Revised Rules of the Supreme Court of the United States.

employees of some of the carriers not to handle American Iron freight.   Teamsters union Local 886, representative of the carriers' employees, instructed the employees to cease handling the freight.   All the carriers except one expressly ordered their employees to move American Iron freight, but nevertheless they refused to do so.   The Teamsters' contract with the carriers contained a provision that, "Members of the Union shall not be allowed to handle or haul freight to or from an unfair company, provided, this is not a violation of the Labor Management Relations Act of 1947."

On the basis of charges filed by American Iron, the Board issued complaints against the unions and found that both the Machinists and Teamsters, by their appeals or instructions to the carriers' employees, had violated § 8 (b)(4)(A), notwithstanding the hot cargo provision in the collective bargaining agreement.   115 N. L. R. B. 800.   The Court of Appeals for the District of Columbia Circuit set aside the order as to the Teamsters because of the hot cargo provision (No. 273), but enforced the order against the Machinists (No. 324).   101 U. S. App. D. C. 80, 247 F. 2d 71.   We granted certiorari in all three cases because of conflicts among the circuits as to the meaning of § 8 (b)(4)(A), and because of the importance of the problem in the administration of the National Labor Relations Act, and ordered them consolidated for argument.   355 U. S. 808.[2]

---

[2] Certain contentions of the unions in Nos. 273 and 324 can be quickly disposed of.   The controversy was not rendered moot simply because, after the filing of the charges and before the complaint issued, picketing had ceased and the Machinists had entered into a collective bargaining agreement containing a no-strike clause.   We cannot say that there was no danger of recurrent violation, see *United States* v. *W. T. Grant Co.,* 345 U. S. 629, 632–633, and that the Board was not justified in concluding that, under all the circumstances, it was desirable to add the sanction of its order to whatever

Section 8 (b)(4)(A) provides that, "It shall be an unfair labor practice for a labor organization or its agents . . . (4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring . . . any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . ."

Whatever may have been said in Congress preceding the passage of the Taft-Hartley Act concerning the evil of all forms of "secondary boycotts" and the desirability of outlawing them, it is clear that no such sweeping prohibition was in fact enacted in § 8 (b)(4)(A). The section does not speak generally of secondary boycotts. It describes and condemns specific union conduct directed to specific objectives. It forbids a union to induce employees to strike against or to refuse to handle goods for their employer when an object is to force him or another person to cease doing business with some third party. Employees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person. Thus, much that might argumentatively be found to fall within the broad and somewhat vague concept of secondary boycott is not in terms prohibited. A boycott voluntarily engaged in by a secondary employer for his own business

agreement the parties had reached. The Machinists' contention that their activity was only legitimate primary activity is foreclosed by the Board's contrary finding on the basis of conflicting evidence.

reasons, perhaps because the unionization of other employers will protect his competitive position or because he identifies his own interests with those of his employees and their union, is not covered by the statute. Likewise, a union is free to approach an employer to persuade him to engage in a boycott, so long as it refrains from the specifically prohibited means of coercion through inducement of employees.

From these considerations of what is not prohibited by the statute, the true scope and limits of the legislative purpose emerge. The primary employer, with whom the union is principally at odds, has no absolute assurance that he will be free from the consequences of a secondary boycott. Nor have other employers or persons who deal with either the primary employer or the secondary employer and who may be injuriously affected by the restrictions on commerce that flow from secondary boycotts. Nor has the general public. We do not read the words "other person" in the phrase "forcing or requiring . . . any employer or other person" to extend protection from the effects of a secondary boycott to such other person when the secondary employer himself, the employer of the employees involved, consents to the boycott. When he does consent it cannot appropriately be said that there is a strike or concerted refusal to handle goods on the part of the employees. Congress has not seen fit to protect these other persons or the general public by any wholesale condemnation of secondary boycotts, since if the secondary employer agrees to the boycott, or it is brought about by means other than those proscribed in § 8 (b)(4)(A), there is no unfair labor practice.

It is relevant to recall that the Taft-Hartley Act was, to a marked degree, the result of conflict and compromise between strong contending forces and deeply held views

on the role of organized labor in the free economic life of the Nation and the appropriate balance to be struck between the uncontrolled power of management and labor to further their respective interests. This is relevant in that it counsels wariness in finding by construction a broad policy against secondary boycotts as such when, from the words of the statute itself, it is clear that those interested in just such a condemnation were unable to secure its embodiment in enacted law. The problem raised by these cases affords a striking illustration of the importance of the truism that it is the business of Congress to declare policy and not this Court's. The judicial function is confined to applying what Congress has enacted after ascertaining what it is that Congress has enacted. But such ascertainment, that is, construing legislation, is nothing like a mechanical endeavor. It could not be accomplished by the subtlest of modern "brain" machines. Because of the infirmities of language and the limited scope of science in legislative drafting, inevitably there enters into the construction of statutes the play of judicial judgment within the limits of the relevant legislative materials. Most relevant, of course, is the very language in which Congress has expressed its policy and from which the Court must extract the meaning most appropriate. Of course § 8 (b)(4)(A), like the entire Taft-Hartley Act, was designed to protect the public interest, but not in the sense that the public was to be shielded from secondary boycotts no matter how brought about. Congress' purpose was more narrowly conceived. It aimed to restrict the area of industrial conflict insofar as this could be achieved by prohibiting the most obvious, widespread, and, as Congress evidently judged, dangerous practice of unions to widen that conflict: the coercion of neutral employers, themselves not concerned with a primary labor dispute, through the inducement of their employees to engage in strikes or concerted refusals to handle goods.

In the light of the purpose of the statute as thus defined the cases now before the Court must be judged.

The question is whether a hot cargo provision, such as is found in the collective bargaining agreements in these cases, can be a defense to a charge of an unfair labor practice under § 8 (b)(4)(A) when, in the absence of such a provision, the union conduct would unquestionably be a violation. This question has had a checkered career in the decisions of the National Labor Relations Board since it first came before that tribunal some nine years ago. In the *Conway's Express* case, *In re International Brotherhood of Teamsters,* 87 N. L. R. B. 972 (1949), aff'd *sub nom. Rabouin* v. *Labor Board,* 195 F. 2d 906, the Board (Members Houston, Murdock, and Gray) found that there was nothing in a hot cargo provision as such repugnant to the policy of the statute, and that the union had not violated § 8 (b)(4)(A) when, pursuant to the provision, it had instructed employees not to handle goods, and the employers had apparently acquiesced. Chairman Herzog concurred in the finding that § 8 (b)(4)(A) had not been violated on the facts of the particular case, but was of the opinion that the hot cargo provision did not license the union itself to take action to induce the employees to refuse to handle goods. 87 N. L. R. B., at 983, n. 33. Member Reynolds dissented on the ground that a hot cargo provision was in conflict with the policy of the statute and could not be invoked as a defense to a charge of a violation of § 8 (b)(4)(A). In the *Pittsburgh Plate Glass* case, *Chauffeurs Union,* 105 N. L. R. B. 740 (1953), where the union had also induced employees not to handle goods and the employers had acquiesced in the enforcement of the hot cargo provisions, the Board without dissent (Members Houston, Murdock, Styles and Peterson; Chairman Herzog took no part) adhered to the *Conway* decision. Since "the employers in this proceeding consented to the 'unfair goods'

provision of the contracts, their employees' failure to handle these goods was not a strike or concerted refusal to work under Section 8 (b)(4)(A)." 105 N. L. R. B., at 744.

In the *McAllister* case, *International Brotherhood of Teamsters,* 110 N. L. R. B. 1769 (1954), the Board took a different position. Members Rodgers and Beeson were of the view that § 8 (b)(4)(A) prohibited all secondary boycotts and had been enacted as much for the protection of the primary employer and the public as the secondary employers, and that a contract between the secondary employers and the union was ineffective to waive the protection granted these other interests. They called for overruling the *Conway* case and a declaration that a hot cargo provision is no defense to a charge under § 8 (b)(4)(A). Chairman Farmer concurred in finding a violation of the statute, on the ground that the case was distinguishable from the *Conway* and *Pittsburgh Plate Glass* decisions in that the employers had not acquiesced in the employees' failure to handle the goods. He found nothing contrary to the statute in the execution of a hot cargo provision and mutual adherence to it by employer and union, but only in the inducement of employees to refuse to handle goods in the face of express instructions to do so. Members Murdock and Peterson dissented on the ground that since the employers had by the hot cargo provision consented in advance to the boycott, there was no strike or concerted refusal to handle goods within the meaning of the statute, apparently even assuming that the employers had instructed their employees to handle the goods.

Still further mutations in the position of the Board and the views of the individual members took place in the *Sand Door* case, *Local 1976, United Brotherhood of Carpenters,* 113 N. L. R. B. 1210 (1955), now here as No. 127. Chairman Farmer and Member Leedom maintained

that, although hot cargo clauses are not themselves in conflict with the statute, any direct appeal by a union to the employees of a secondary employer to induce them to refuse to handle goods, and in this manner to assert their rights under the contract, violates § 8 (b)(4)(A). The importance of the fact that, evidently, the employer in the case before the Board had not acquiesced in the stoppage was not made clear. Member Rodgers concurred in the result on the basis of the principal opinion in the *McAllister* case and his view that hot cargo clauses as such violate the policy of the statute. Members Murdock and Peterson, dissenting, adhered to the views they had expressed in *McAllister*. See also *Local 11, United Brotherhood of Carpenters (General Millwork Corp.)*, 113 N. L. R. B. 1084, 1086–1087, and Members Murdock and Peterson dissenting at 1088–1090, aff'd *sub nom. Labor Board* v. *Local 11, United Brotherhood of Carpenters*, 242 F. 2d 932 (C. A. 6th Cir.).

In the *American Iron* case, *General Drivers Union*, 115 N. L. R. B. 800 (1956), now here as Nos. 273 and 324, Members Leedom and Bean relied on the principal opinion in the *Sand Door* case, making it clear that any direct appeal to the employees was forbidden whether or not the employer acquiesced in the boycott. Member Rodgers concurred on the basis of his previous opinions. Members Murdock and Peterson dissented, noting that since there was a violation of the statute even if the employer acquiesced, the *Conway* doctrine had at last been clearly repudiated. See also *Milk Drivers Union (Crowley's Milk Co.)*, 116 N. L. R. B. 1408 (1956), orders reversed and enforcement denied *sub nom. Milk Drivers Union* v. *Labor Board*, 245 F. 2d 817 (C. A. 2d Cir.).

In a decision handed down after the granting of certiorari in the cases now before the Court, *Truck Drivers Union (Genuine Parts Co.)*, 119 N. L. R. B. 399 (1957), two members of the Board, Chairman Leedom and Mem-

ber Jenkins, rested on a broader ground than that taken in the principal opinion in the *Sand Door* and *American Iron* cases: when the secondary employer is a common carrier subject to the Interstate Commerce Act, 24 Stat. 379, as amended by Act of Aug. 9, 1935, 49 Stat. 543, amended, 49 U. S. C. §§ 301–327, a hot cargo clause is invalid at its inception and cannot be recognized by the Board as having any force or effect. It is also strongly suggested in the opinion filed by these members that it would be desirable to establish such a rule in respect to all employers, and that the mere existence of a hot cargo clause should be deemed prima facie evidence of inducement in violation of § 8 (b)(4)(A). Member Rodgers concurred on the basis of his earlier opinions, without considering the implications of the Interstate Commerce Act. Member Bean concurred solely on the basis of the *Sand Door* case. Member Murdock dissented, objecting particularly to what he conceived to be the extreme suggestion that the mere existence of a hot cargo provision should be deemed prima facie evidence of a violation of § 8 (b)(4)(A), and pointing out that a majority of the Board appears to have abandoned the theory of the *Sand Door* and *American Iron* cases even before this Court could review them.

The argument that a hot cargo clause is a defense to a charge of a violation of § 8 (b)(4)(A) may be thus stated. The employer has by contract voluntarily agreed that his employees shall not handle the goods. Because of this consent, even if it is sought to be withdrawn at the time of an actual work stoppage and boycott, it cannot be said, in the light of the statutory purpose, either that there is a "strike or a concerted refusal" on the part of the employees, or that there is a "forcing or requiring" of the employer. Only if consideration is confined to the circumstances immediately surrounding the boycott, in disregard of the broader history of the labor

relations of the parties, is it possible to say that the employer is coerced into engaging in the boycott. If the purpose of the statute is to protect neutrals from certain union pressures to involve them involuntarily in the labor disputes of others, protection should not extend to an employer who has agreed to a hot cargo provision, for such an employer is not in fact involuntarily involved in the dispute. This must at least be so when the employer takes no steps at the time of the boycott to repudiate the contract and to order his employees to handle the goods. The union does no more than inform the employees of their contractual rights and urge them to take the only action effective to enforce them.

The Board in the present cases has rejected the argument as not comporting with the legislative purpose to be drawn from the statute, projected onto the practical realities of labor relations. We agree, duly heedful of the strength of the argument to the contrary. There is nothing in the legislative history to show that Congress directly considered the relation between hot cargo provisions and the prohibitions of § 8 (b)(4)(A). Nevertheless, it seems most probable that the freedom of choice for the employer contemplated by § 8 (b)(4)(A) is a freedom of choice at the time the question whether to boycott or not arises in a concrete situation calling for the exercise of judgment on a particular matter of labor and business policy. Such a choice, free from the prohibited pressures—whether to refuse to deal with another or to maintain normal business relations on the ground that the labor dispute is no concern of his—must as a matter of federal policy be available to the secondary employer notwithstanding any private agreement entered into between the parties. See *National Licorice Co.* v. *Labor Board*, 309 U. S. 350, 364. This is so because by the employer's intelligent exercise of such a choice under the impact of a concrete situation when judgment is most

responsible, and not merely at the time a collective bargaining agreement is drawn up covering a multitude of subjects, often in a general and abstract manner, Congress may rightly be assumed to have hoped that the scope of industrial conflict and the economic effects of the primary dispute might be effectively limited.

Certainly the language of the statute does not counter such an interpretation. The employees' action may be described as a "strike or concerted refusal," and there is a "forcing or requiring" of the employer, even though there is a hot cargo provision. The realities of coercion are not altered simply because it is said that the employer is forced to carry out a prior engagement rather than forced now to cease doing business with another. A more important consideration, and one peculiarly within the cognizance of the Board because of its closeness to and familiarity with the practicalities of the collective bargaining process, is the possibility that the contractual provision itself may well not have been the result of choice on the employer's part free from the kind of coercion Congress has condemned. It may have been forced upon him by strikes that, if used to bring about a boycott when the union is engaged in a dispute with some primary employer, would clearly be prohibited by the Act. Thus, to allow the union to invoke the provision to justify conduct that in the absence of such a provision would be a violation of the statute might give it the means to transmit to the moment of boycott, through the contract, the very pressures from which Congress has determined to relieve secondary employers.

Thus inducements of employees that are prohibited under § 8 (b)(4)(A) in the absence of a hot cargo provision are likewise prohibited when there is such a provision. The Board has concluded that a union may not, on the assumption that the employer will respect his contractual obligation, order its members to cease handling

goods, and that any direct appeal to the employees to engage in a strike or concerted refusal to handle goods is proscribed. This conclusion was reached only after considerable experience with the difficulty of determining whether an employer has in fact acquiesced in a boycott, whether he did or did not order his employees to handle the goods, and the significance of an employer's silence. Of course if an employer does intend to observe the contract, and does truly sanction and support the boycott, there is no violation of § 8 (b)(4)(A). A voluntary employer boycott does not become prohibited activity simply because a hot cargo clause exists. But there remains the question whether the employer has in fact truly sanctioned and supported the boycott, and whether he has exercised the choice contemplated by the statute. The potentiality of coercion in a situation where the union is free to approach the employees and induce them to enforce their contractual rights by self-help is very great. Faced with a concerted work stoppage already in progress, an employer may find it substantially more difficult than he otherwise would to decide that business should go on as usual and that his employees must handle the goods. His "acquiescence" in the boycott may be anything but free. In order to give effect to the statutory policy, it is not unreasonable to insist, as the Board has done, that even when there is a contractual provision the union must not appeal to the employees or induce them not to handle the goods. Such a rule expresses practical judgment on the effect of union conduct in the framework of actual labor disputes and what is necessary to preserve to the employer the freedom of choice that Congress has decreed. On such a matter the judgment of the Board must be given great weight, and we ought not set against it our estimate of the relevant factors.

There is no occasion to consider the invalidity of hot cargo provisions as such. The sole concern of the Board

in the present cases was whether the contractual provision could be used by the unions as a defense to a charge of inducing employees to strike or refuse to handle goods for objectives proscribed by § 8 (b)(4)(A). As we have said, it cannot be so used. But the Board has no general commission to police collective bargaining agreements and strike down contractual provisions in which there is no element of an unfair labor practice. Certainly the voluntary observance of a hot cargo provision by an employer does not constitute a violation of § 8 (b)(4)(A), and its mere execution is not, contrary to the suggestion of two members of the Board in the *Genuine Parts* case, *Truck Drivers Union,* 119 N. L. R. B. 399, prima facie evidence of prohibited inducement of employees. It does not necessarily follow from the fact that the unions cannot invoke the contractual provision in the manner in which they sought to do so in the present cases that it may not, in some totally different context not now before the Court, still have legal radiations affecting the relations between the parties. All we need now say is that the contract cannot be enforced by the means specifically prohibited in § 8 (b)(4)(A).

In Nos. 273 and 324, the Board in its brief suggests that we should go further and find that the contract provisions in these cases are invalid as such because the secondary employers are common carriers subject to the Interstate Commerce Act, 24 Stat. 379, as amended by Act of Aug. 9, 1935, 49 Stat. 543, amended, 49 U. S. C. §§ 301–327. In the recent *Genuine Parts* case, already referred to, *Truck Drivers Union,* 119 N. L. R. B. 399, two members of the Board in fact took this position, stating that when common carriers are involved hot cargo clauses are "invalid at their inception and can be given no operative cognizance so far as the administration of this [the Labor Management Relations] Act is con-

cerned." This is true, it is said, because by entering a contract not to handle the goods the carrier violates its obligations under the Interstate Commerce Act to provide nondiscriminatory service and to observe just and reasonable practices. See Act of Aug. 9, 1935, § 216, 49 Stat. 558, amended, 49 U. S. C. § 316. The carrier's consent to boycott is therefore void, and it follows that it is likewise void for all purposes concerned with the Labor Management Relations Act. Since the *Genuine Parts* decision was handed down, the Interstate Commerce Commission has in fact ruled, in *Galveston Truck Line Corp.* v. *Ada Motor Lines, Inc.,* 73 M. C. C. 617 (Dec. 16, 1957), that the carriers there involved were not relieved from their obligations under the Interstate Commerce Act by a hot cargo clause.

It is significant to note the limitations that the Commission was careful to draw about its decision in the *Galveston* case. It was not concerned to determine, as an abstract matter, the legality of hot cargo clauses, but only to enforce whatever duty was imposed on the carriers by the Interstate Commerce Act and their certificates. The Commission recognized that it had no general authority to police such contracts, and its sole concern was to determine whether a hot cargo provision could be a defense to a charge that the carriers had violated some specific statutory duty. It is the Commission that in the first instance must determine whether, because of certain compelling considerations, a carrier is relieved of its usual statutory duty, and necessarily it makes this determination in the context of the particular situation presented by the case before it. Other agencies of government, in interpreting and administering the provisions of statutes specifically entrusted to them for enforcement, must be cautious not to complicate the Commission's administration of its own act by assuming as a fixed and universal rule what the Commission itself may prefer

to develop in a more cautious and pragmatic manner through case-by-case adjudication.

But it is said that the Board is not enforcing the Interstate Commerce Act or interfering with the Commission's administration of that statute, but simply interpreting the prohibitions of its own statute in a way consistent with the carrier's obligations under the Interstate Commerce Act. Because of that Act a carrier cannot effectively consent not to handle the goods of a shipper. Since he cannot effectively consent, there is, under § 8 (b)(4)(A), a "strike or concerted refusal," and a "forcing or requiring" of the carrier to cease handling goods just as much as if no hot cargo clause existed. But the fact that the carrier's consent is not effective to relieve him from certain obligations under the Interstate Commerce Act does not necessarily mean that it is ineffective for all purposes, nor should a determination under one statute be mechanically carried over in the interpretation of another statute involving significantly different considerations and legislative purposes. Whether a carrier has without justification failed to provide reasonable and nondiscriminatory service is a question of defining the carrier's duty in the framework of the national transportation policy. Whether there is a "strike or concerted refusal," or a "forcing or requiring" of an employer to cease handling goods is a matter of the federal policy governing labor relations. The Board is not concerned with whether the carrier has performed its obligations to the shipper, but whether the union has performed its obligation not to induce employees in the manner proscribed by § 8 (b)(4)(A). Common factors may emerge in the adjudication of these questions, but they are, nevertheless, distinct questions involving independent considerations. This is made clear by a situation in which the carrier has freely agreed with the union to engage in a boycott. He may have failed in his obligations under

the Interstate Commerce Act, but there clearly is no violation of § 8 (b)(4)(A); there has been no prohibited inducement of employees.

The case is not like that in *Southern S. S. Co.* v. *Labor Board,* 316 U. S. 31, where the Board was admonished not to apply the policies of its statute so single-mindedly as to ignore other equally important congressional objectives. A specific remedy ordered by the Board—reinstatement of employees who had engaged in a strike—worked directly to weaken the effectiveness of a statutory prohibition against mutiny by members of the crew of a vessel. Presumed illegality under the mutiny statute was not used to establish a violation of the labor statute. It was relied on to establish an abuse of discretion in giving a remedy. Much less was there any suggestion that the Board should abandon an independent inquiry into the requirements of its own statute and mechanically accept standards elaborated by another agency under a different statute for wholly different purposes.

The unions in Nos. 273 and 324 violated § 8 (b)(4)(A) for the reasons set forth in the first part of this opinion, and not as a consequence of prohibitions in the Interstate Commerce Act.

The judgments in Nos. 127 and 324 are affirmed. The judgment in No. 273 is reversed and the cause remanded to the Court of Appeals with instructions to grant enforcement of the order of the Board.

Nos. 127 and 324—*Affirmed.*
No. 273—*Reversed and remanded.*

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE and MR. JUSTICE BLACK concur, dissenting.

The Court concedes that the voluntary observance of a hot cargo provision by an employer does not constitute a violation of § 8 (b)(4)(A) of the National Labor Rela-

tions Act,[1] 61 Stat. 136, 140, 29 U. S. C. § 158 (b)(4)(A). I fail to see, therefore, why enforcement of a provision in a collective bargaining agreement outlawing work in nonunion goods violates the Act.

The provision of the collective bargaining agreement in the *Carpenters* case is typical of those in issue here:

> "Workmen shall not be required to handle non-union material."

That provision was bargained for like every other clause in the collective agreement. It was agreed to by the employer. How important it may have been to the parties—how high or low in their scale of values—we do not know. But on these records it was the product of bargaining, not of coercion. The Court concedes that its inclusion in the contracts may not be called "forcing or requiring" the employer to cease handling other products within the meaning of the Act. Enforcing the collective bargaining agreement—standing by its terms—is not one of the coercive practices at which the Act was aimed. Enforcement of these agreements is conducive to peace. Disregard of collective agreements—the flouting of them—is disruptive. That was the philosophy of the

---

[1] That provision of the Act reads as follows:
"It shall be an unfair labor practice for a labor organization or its agents—

.      .      .      .      .

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person; . . . ."

*Conway's Express* decision of the Labor Board, 87 N. L. R. B. 972, aff'd *sub nom. Rabouin* v. *Labor Board,* 195 F. 2d 906; and I think it squares with the Act.

The present decision is capricious. The boycott is lawful if the employer agrees to abide by this collective bargaining agreement. It is unlawful if the employer reneges.

The hostile attitude of labor against patronizing or handling "unfair" goods goes deep into our history. It is not peculiarly American, though it has found expression in various forms in our history [2] from the refusal of Americans to buy British tea, to the refusal of Abolitionists to buy slave-made products, to the refusal of unions to work on convict-made or on other nonunion goods. Unions have adhered to the practice because of their principle of mutual aid and protection. Section 7 of the Act, indeed, recognizes that principle in its guarantee that "Employees shall have the right . . . to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection." We noticed in *Apex Hosiery Co.* v. *Leader,* 310 U. S. 469, 503, that the elimination of "competition from non-union made goods" was a legitimate labor objective.

The reason an employer may also agree to that phase of union policies, the reason he may acquiesce in the inclusion of such a clause in a particular collective agreement, may only be surmised. Perhaps he sees eye to eye with the union. Perhaps he receives important concessions in exchange for his assistance to the union.

Certain it is that where he voluntarily agrees to the "unfair" goods clause he is not forced or coerced in the

---

[2] See Millis and Montgomery, Organized Labor (1945), 581 *et seq.;* Wolman, The Boycott in American Trade Unions (1916), cc. II, III.

statutory sense. What Judge Clark said in *Milk Drivers & Dairy Employees* v. *Labor Board*, 245 F. 2d 817, 822, has not yet been answered:

> "In the absence of a prior agreement, work to be done by employees is determined unilaterally by the employer; but where a collective agreement specifies the work to be done, that agreement defines the normal work of the employees and a 'strike' or 'refusal' must be a refusal to do that normal work. The employer obviously cannot impose additional work on the employees contrary to the agreement and then charge that their refusal to perform it constitutes an unfair practice. We see no difference in this respect between tasks exempted by the agreement because they are offensive to health or safety and tasks exempted because their performance is contrary to the interests of organized labor and, in this case, the local itself."

We act today more like a Committee of the Congress than the Court. We strain to outlaw bargaining contracts long accepted, long used.[3] Perhaps these particular pro-

---

[3] "Sympathetic support by members of one union for organized workers in other plants or in other trades and industries often finds expression in union agreements. Any union looks upon nonunion conditions of work as a threat to its own union working standards. Consequently it is often provided in agreements that the employer may not require employees to work on material coming from or destined for manufacturers not operating under union agreements. Other agreements limit the prohibition to material coming from employers who have been declared 'unfair' to organized labor by an affiliated union. This reduces considerably the list of restricted manufacturers, since many employers who do not deal with organized labor have never been declared 'unfair' by unions having nominal jurisdiction. Another alternative merely prohibits work on materials coming from or destined for manufacturers whose employees are on strike. Agreements covering factory production workers may

visions have evils in them that should be declared contrary to the public interest. They are, however, so much a part of the very fabric of collective bargaining that we should leave this policy-making to Congress and not rush in to undo what a century or more of experience has imbedded into labor-management agreements. I have not found a word of legislative history which even intimates that these "unfair" goods provisions of collective bargaining agreements are unlawful.

---

require that all building repairs and maintenance work as well as all hauling of goods and materials into and away from the employer's premises must be done by union workers." Union Agreement Provisions, U. S. Dept. of Labor, H. R. Doc. No. 723, 77th Cong., 2d Sess. 32. And see Collective Bargaining Provisions, U. S. Dept. of Labor, H. R. Doc. No. 282, 81st Cong., 1st Sess. 37; Strikes and Lockouts (Preliminary Draft), U. S. Dept. of Labor, February 1947, pp. 28–32; Strikes and Lockouts, Bureau of National Affairs, 1956, 77:351.