265 F.2d 439
 TRUCK DRIVERS AND HELPERS LOCAL UNION NO. 728 INTERNATIONAL
BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN
AND HELPERS OF AMERICA, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 17288.
 United States Court of Appeals Fifth Circuit.
 April 8, 1959, Rehearing Denied June 11, 1959.
 
 Edwin Pearce, John S. Patton, Poole, Pearce & Hall, Atlanta, Ga., for petitioner.
 Franklin C. Milliken, Atty., Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Jerome D. Fenton, Gen. Counsel, Norton J. Come, Deputy Asst. Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.
 Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.
 WISDOM, Circuit Judge.
 
 
 1
 The matter before us concerns a secondary boycott by members of the Teamsters Union. Two questions are before us. (1) Did the Union induce the boycott or was the boycott a result of individual action? (2) Were the union activities privileged under the hot cargo clause?
 
 
 2
 The Union[1] is the certified bargaining agent of the production and maintenance employees of the Rayloc Division of the Genuine Parts Company.[2] The National Labor Relations Board found that the Union violated Section 8(b)(4)(A)[3] of the National Labor Relations Act. 61 Stat. 136, 29 U.S.C.A. 141 et seq. The Board held that the Union induced the employees of freight carriers in the Atlanta, Georgia, area to refuse to handle freight from Rayloc in order the force the carriers to stop doing business with Rayloc.[4] The Board issued a cease and desist order against such Union action. The Union filed a petition to review and set aside the order. In its answer the Board asked for enforcement of its order. We deny the petition and grant enforcement of the Board order.
 
 I.
 
 3
 The Union is the certified bargaining agent of the production and maintenance employees of the Rayloc Division of the Genuine Parts Company. March 12, 1956, the Teamsters struck in support of collective bargaining demands made upon Genuine Parts and set up picket lines at all Genuine Parts installations in the Atlanta area.
 
 
 4
 Most of the employees of the various freight carriers in Atlanta who perform trucking services for Genuine Parts are members of the Teamsters Union. The labor contract with the carriers contain a hot cargo clause,[5] sanctioning the refusal of union members to go through a picket line and refusal to handle non-union, 'unfair' or 'struck' goods. When the carrier employees refused to go through the picket lines, Genuine Parts got the freight to the carrier docks on its own, and the carriers experienced little difficulty in getting their employees to handle the Genuine Parts freight that came to their docks. All went well with the carriers until March 27. That day the Union held a special meeting of its members.
 
 
 5
 The meeting was called by the Union's Secretary-Treasurer, Mathis 'for the Specific purpose of determining whether the members wanted to handle the goods of Genuine Parts and Rayloc or not to handle them'. The Union's total membership is about 5,500. Of this number, 2,500 are covered by the area-wide labor contracts between the carriers and the Union. 400 attended the meeting. No employees were present from at least three or four of the carriers subject to the agreements.
 
 
 6
 Secretary-Treasurer Mathis opened the meeting by bringing the employees up to date on the bargaining difficulties the Union was having with Genuine Parts: the Union could not get any kind of 'decent agreement'. The purpose of the meeting, Mathis said, was to determine whether the members (carrier employees) would support the strike against Genuine Parts by refusing to handle its hot cargo. He read the hot cargo clause to the members present, outlined the machinery by which they might avoid the prohibitions of Section 8(b)(4)(A), and stated that a resolution would be presented to the membership for their acceptance or rejection.
 
 
 7
 Skilfully, and all in one breath, Mathis called for individual action (to avoid the secondary boycott provision of the Act) and at the same time promised to back it up with collective strike action by the Union. After a full discussion, one of the members, Kent, still under the impression that Mathis wanted group action, moved 'that the members of Local 728 refuse to handle the goods of Rayloc and Genuine Parts'. This was a clear call for collective secondary action, showing that at least Kent failed to understand Mathis' distinctions between individual and group action. Mathis rejected Kent's resolution, because it did not state that the employees desired 'to exercise their rights as individuals'. Mathis then presented his own resolution. This resolution was adopted unanimously. It reads, in part, as follows:
 
 
 8
 'Each member has the right to make an individual voluntary decision as to whether he will or will not handle goods or equipment consigned to or received from this Company. In accordance with this right each of the members has made and now announces his individual voluntary decision not to handle such goods. Under the * * * (Articles of Agreements with the carriers) it is the obligation of the Union to give each employer notice of the intent of the members to refuse to handle these unfair goods and in order to comply with the obligations of these Articles, the officials of the Union are hereby requested to notify each carrier employer of the intent of these members to refuse to handle these described unfair goods.'
 
 
 9
 The day after the meeting the Union notified the carriers that, exercising their rights under the hot cargo clause, 'the members have each made an individual voluntary decision to refuse to handle goods or equipment consigned to or received from' Genuine Parts. Thereafter, any employee who was asked to handle the freight gave the stock reply: 'I personally refuse to handle.' None of the employees were discharged. There was evidence that the Union advised carrier employers that a discharge would provoke a strike.
 
 
 10
 Aside from the general refusal expressed by the employees after the meeting, Union stewards at the premises of two carriers encouraged specific refusals. Woodbury, a steward, told Simpson, of the Simpson Express Company, that if he handled the freight, 'the boys would probably walk off the job'. The Union denies that Woodbury made the statement, but Simpson's testimony is to the contrary. The statement was made in front of the employees. Union steward Jimmie Butler told the employees at Akers Motor Lines that he would file a grievance against them if they handled 'scab freight' of Genuine Parts.
 
 
 11
 The Union argues that we should set aside the Board's order because the record does not show that the action of the employees was induced or encouraged by the Union: (1) the employees were merely exercising their individual rights not to handle the freight; (2) the special meeting was called only for the purpose of finding out what the employees were going to do, to explain their rights under the contracts, and this, says the Union, was the only way it could give advance notice to the employers, as it was bound to do under the hot cargo clauses, that the employees were not going to handle the freight.
 
 
 12
 The Union's special meeting must be viewed against the whole background of the case. The Union was striking against Genuine Parts. The carriers' employees were respecting the picket line, but Genuine Parts was getting its own freight to the carriers with its own vehicles and by hiring independent drayage companies. Thus, the picket lines were not taking effect. It was only then that the Union called its meeting to find out if the carrier employees would refuse to handle the freight. Mathis assured the secondary employees that the Union would back them up by collective strike action and threatened reprisals against the secondary employers. It seemed to the Board, and it seems to us, that the distinction between individual action and collective action was not just fuzzy and confused; there was a deliberate attempt to produce collective union action by the Union acting as a union but termed, for the purpose of subterfuge, individual action. The meeting was called by the Union's Secretary, conducted by union officers, and the members voted as members of the Union. The result of the meeting was the unanimous pasage of a resolution that committed all the members, even absent members, to a secondary boycott. Under the resolution there is no room for any discretion by any employees who might later decide to handle the goods. It binds all in advance, preventing the exercise of individual action at the time when individual action is meaningful-- that is, when the goods arrive at the dock to be unloaded.
 
 
 13
 We are persuaded, as was the Board, that the action was union action to induce the employees of the carriers not to handle the freight and to impose the Teamsters' will on the secondary employees and employers. The words 'induce and encourage' in Section 8(b)(4)(A), the Supreme Court states, are 'broad enough to include in them every form of influence and persuasion'. International Brotherhood of Electrical Workers, Local 501, A.F. of L. v. N.L.R.B., 1950, 341 U.S. 694, 71 S.Ct. 954, 958, 95 L.Ed. 1299. They cover the union activities in this case.
 
 
 14
 Whatever contractual duty the Union had to notify the carriers that their employees would not handle the freight from Genuine Parts, and even if a meeting is a practical way of ascertaining the employees' intentions, this duty is still subordinate to the statutory proscription of Section 8(b)(4)(A).
 
 II.
 
 15
 After the Board decided the Genuine case, the United States Supreme Court shed a great deal of light on the perplexing problem of secondary boycott in its decision in Local 1976, United Brotherhood of Carpenters, etc. v. N.L.R.B., 1958, 357 U.S. 93, 78 S.Ct. 1011, 1016, 2 L.Ed.2d 1186. The Supreme Court pointed out that although Section 8(b)(4)(A), like the entire Taft-Hartley Act, was designed to protect the public interest, Congress did not intend to shield the public from secondary boycotts no matter how brought about. 'Congress' purpose was more narrowly conceived.' It aimed to prohibit 'coercion of neutral employers, themselves not concerned with a primary labor dispute, through the inducement of their employees to engage in strikes or concerted refusals to handle goods'. The Court held, however, that a hot cargo clause, although not illegal per se, is not a shield of immunity to conduct prohibited in Section 8(b)(4)(A). 'Thus inducements of employees that are prohibited under 8(b)(4)(A) in the absence of a hot cargo provision are likewise prohibited when there is such a provision (in a labor contract).' The Supreme Court said:
 
 
 16
 '(Section 8(b)(4)(A)) describes and condemns specific union conduct directed to specific (union) ofjectives. It forbids a union to induce employees to strike against or to refuse to handle goods for their employer when an object is to force him or another person to cease doing business with some third party. Employees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person.'
 
 
 17
 With these criteria in mind, we hold that there is substantial evidence in the record to support the Board's finding that the Union violated Section 8(b)(4) (A). Universal Camera Corporation v. N.L.R.B., 1950, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456.
 
 III.
 
 18
 The Union argues that the Board's order is too broad and should be modified. The order directs the Union to cease and desist from engaging in or from inducing and encouraging carrier employees to engage in a strike or concerted refusal to handle Genuine Parts freight, or the freight of 'any other like person or company who had business relations with aforementioned carriers in the Atlanta area'. The Board argues that the Union's repeated violations of the Act's secondary boycott provision justifies a broad order. N.L.R.B. v. Express Publishing Co., 1941, 312 U.S. 426, 61 S.Ct. 693, 85 L.Ed. 930. On the basis of the record before us we think that the order goes beyond the power of the Board and must be modified by deleting the words 'or with any other like person or company who has public relations with aforementioned carriers in the Atlanta area'. N.L.R.B. v. Ford Motor Co., 5 Cir., 1941, 119 F.2d 326.
 
 
 19
 Enforcement of the Board's order as herein modified is granted.
 
 
 
 [1]
 Turck Drivers and Helpers Local No. 728, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO
 
 
 [2]
 Genuine Parts Company is engaged in the manufacture, rebuilding and wholesaling of automotive parts. Its Rayloc Division, here involved, shipped from its Atlanta plant to customers outside the state, products of a value in excess of $500,000
 
 
 [3]
 Section 8(b)(4)(A) of the Act declares it to be an unfair labor practice for a labor organization or its agents: 'to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to * * * handle or work on any goods * * * where an object thereof is: (A) forcing or requiring any employer * * * to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person.' 61 Stat. 141, 29 U.S.C.A. 158(b)(4)(A) (1952)
 
 
 [4]
 The Board's decision and order are reported at 119 N.L.R.B. No. 53. The order was issued pursuant to Section 10(c) of the National Labor Relations Act, as amended (61 Stat. 136, 29 U.S.C.A. 151 et seq.). This Court has jurisdiction under Section 10(e) and (f) of the Act, the unfair labor practices having occurred in Atlanta, Georgia, within this judicial circuit
 
 
 [5]
 The clause reads: 'It shall not be a violation of this Agreement and it shall not be cause for discharge if any employee or employees refuse to go through the picket line of a Union or refuse to handle unfair goods. Nor shall the exercise of any rights permitted by law be a violation of this Agreement. The Union and its members, individually and collectively, reserve the right to refuse to handle goods from or to any firm or truck which is engaged or involved in any controversy with this or any other Union; and reserve the right to refuse to accept freight from, or to make pick-ups from or deliveries to establishments where picket lines, strikes, walkout or lockout exist. The term 'unfair goods' as used in this Article includes, but is not limited to, any goods or equipment transported, interchanged, handled, or used by any carriers, whether party to this Agreement or not, at any of whose terminals or places of business there is a controversy between such carrier, or its employees on the one hand, and a labor union on the other hand; and such goods or equipment shall continue to be 'unfair' while being transported, handled or used by interchanging or succeeding carriers, whether parties to this Agreement or not, until such controversy is settled. The Union agrees that, in the event the Employer becomes involved in a controversy with any other union, the Union will do all in its power to help effect a settlement. The Union shall give the Employer notice of all strikes and/or the intent of the Union to strike any Employer, and/or place of business, and/or the intent of members' refusal to handle unfair goods. The Carriers will be given an opportunity to deliver any and all freight in their physical possession at the time of receipt of motive. Any freight received by a carrier up to midnight of the day of notification shall be considered to be in its physical possession. However, freight in the possession of a connecting carrier shall not be considered to be in the physical possession of the delivering carrier. The insistence on the part of Employer that his employees handle unfair goods or go through a picket line after they have elected not to, and such refusal has been approved in writing by the responsible officials of the Southern States Drivers Council, shall be sufficient cause for an immediate strike of all such Employer's operation without any need to go through the grievance procedure herein.'