Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,

v.

UNITED STEELWORKERS OF AMERICA, AFL–CIO, and Laurel Hill Refinery Workers Union Local No. 4355, United Steelworkers of America, AFL–CIO, Respondents.

Civ. No. 20002.

United States District Court
E. D. New York.

Sept. 22, 1959.

814

Stuart Rothman, Washington, D. C., for petitioner, Jacques Schurre, Washington, D. C., of counsel.

Debevoise, Plimpton & McLean, New York City, for Charging Party, Joseph Barbash, New York City, of counsel.

Arthur Werner and Abraham Friedman, New York City, for respondents.

RAYFIEL, District Judge.

The petitioner, as a regional director of the National Labor Relations Board, hereinafter called the Board, and in be-half of said Board, filed his petition under § 10(*l*) of the National Labor Relations Act, as amended 29 U.S.C.A. § 160 (*l*) hereinafter called the Act, for appropriate injunctive relief pending the Board's final determination of charges filed with it by Phelps Dodge Refining Corporation, hereinafter called Phelps Dodge, alleging that the respondents have engaged and are still engaging in acts and conduct which are violative of § 8(b)(4)(A) of the Act, which provides that

"It shall be an unfair labor practice for a labor organization or its agents—
\* \* \*

(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the product of any other producer, processor, or manufacturer, or to cease doing business with any other person."

The petition charges, *inter alia*, that Phelps Dodge entered into agreements with T. F. Contracting Co., Inc., hereinafter called T. F., A. Munder & Sons, Inc., hereinafter called Munder, and several other contractors therein named, for the construction of a new bag house and flue system at its plant at a cost of approximately $1,700,000, and that construction thereunder commenced on or about April 1, 1959; that on or about July 31, 1959 Phelps Dodge installed a gate in the fence forming the east boundary of its property, referred to in said petition as the contractors' gate, which was intended for the exclusive use of said contractors and their employees, and at which was posted a sign reading "contractors only". Guards (supervisory employees of Phelps Dodge) were stationed at the gate to see that it

was used by none other than employees of said contractors, and Phelps Dodge notified respondents that the gate was installed for the exclusive use of such employees.

The petitioner alleges further that at no time material to his application herein have the respondents had any labor dispute with any of the aforementioned contractors; that since on or about August 1, 1959 the respondents have been engaged in a labor dispute with, and a strike against, Phelps Dodge, and have picketed at the said contractors' gate and an approach thereto known as the Haberman's Crossing, which is located at the intersection of 56th Road and 49th Street; that respondents have appealed to the employees of Munder and the other contractors not to perform any services for their employers on said construction work, and that as a result of such appeals, and other acts and conduct of the respondents, the said employees have refused to perform their work, by reason whereof the said construction is at a standstill.

Further, that on or about August 4, 1959 Phelps Dodge filed charges with the Board wherein it alleged that the respondents had engaged and were engaging in unfair labor practices within the meaning of § 8(b)(4)(A) of the Act; that said charges were referred to petitioner for investigation, and that as a result thereof he has reasonable cause to believe the charges to be true and that a complaint to the Board should issue.

A hearing on the application was held on August 24, 1959, testimony was adduced, and documentary evidence received. From the pleadings and the evidence I find the facts to be as follows:

Phelps Dodge maintains a copper smelting and refining plant in Maspeth, Queens County, New York, known as its Laurel Hill Plant, from which according to said petition, it has shipped more than $1,000,000 of its products to various places outside the State of New York during the past year. The main office of the plant is located at or about the southwest corner of 43rd Street and 55th Drive.

The north boundary of the plant proper is about one block south thereof, and runs along the tracks of the Long Island Railroad, commencing at a point about 440 feet west of 43rd Street and continuing in an easterly direction for a distance of about 1,800 feet. The plant is bounded on the south by Newtown Creek and on the east by the plant of Premier Container Corp., hereinafter called Premier, from which it is separated by a chain link fence, running approximately north to south, and extending from a point near said railroad tracks to Newtown Creek, a distance of about 700 feet. It was at a point near the southerly end of that fence, and near the southeasterly corner of the Phelps Dodge plant, that the aforementioned contractors' gate was cut.

On or about April 1, 1959 Phelps Dodge, for the purpose of bringing its plant and the operation thereof into compliance with regulations or orders of the Department of Air Pollution Control of the City of New York, and at the direction of City authorities, commenced the installation of a new flue system and other construction work, for the performance of which it engaged the services of T. F., Munder, and several other contractors. That construction work was still in progress on August 1, 1959 when the respondents, collective bargaining representatives of a great number of Phelps Dodge hourly-paid employees, went on strike. Anticipating the strike, and a day or two prior thereto, Phelps Dodge instructed T. F. to make an opening in the fence forming the east boundary of its plant and to install a gate to provide a means of entry thereto. It is that gate which has been hereinabove referred to as the contractors' gate.

On August 1st respondents' pickets first appeared in the vicinity of the plant. Several appeared on 43rd Street, immediately north of the railroad tracks, at a point leading toward the plant entrance, while others were stationed at the intersection of Clay and 57th Avenues, at which is located the *only* entrance to the Phelps Dodge plant for its own employees

and those of the various contractors supplying it.

Beginning on or about August 1st the employees of T. F., Munder, and the other contractors participating in the construction project, as well as the vehicles which transported them and necessary equipment and supplies, entered the plant through the contractors' gate. As hereinabove stated, the respondents and Phelps Dodge's employees had been informed that the said gate was intended for the exclusive use of the contractors engaged in the construction project and their employees. This is the manner in which the employees of said contractors reached the said gate and the Phelps Dodge plant. Their trucks would arrive at 56th Road and 49th Street at a point called Haberman's Crossing, and then proceed south along 49th Street to a point where they would effect an entrance into the Premier plant, through which they would then pass until they reached the contractors' gate.

On August 3rd a car containing one or more of Munder's employees approached Haberman's Crossing, apparently on its way to the contractors' gate. It was hailed by several of the respondents' pickets, one of whom said to its driver: "You can't go. We are on strike".

On August 10th the respondents had pickets posted at Haberman's Crossing, despite the fact that it is located some 2,000 feet east of the only entrance to the Phelps Dodge plant, and at least 800 feet east of the most easterly point of said plant property. Pickets were also stationed at the aforementioned entrance to the Premier plant as well as the contractors' gate.

Prior to 8:00 a. m. on August 10th several of the respondents' pickets caused a Buick automobile to be parked near the contractors' gate in such a position as to almost completely obstruct that entrance to the plant, and then made access thereto impossible by covering the remaining part of the opening with a card table. Pickets' signs were then hung on both the Buick car and the card table.

Shortly thereafter a Mr. Coleman, superintendent of T. F., arrived in the vicinity of the gate with two of its employees. He had intended to enter the Phelps Dodge plant through the contractors' gate, but was unable to do so because of the obstructions placed there by the pickets. He brought his car to a stop at a point east of the Buick and asked one of the two pickets then stationed there to remove the Buick so that he might enter the plant, but the picket refused to do so. Several other pickets then arrived and took positions in front of Coleman's car. A Mr. Richardson, works manager for Phelps Dodge, who was present at the time, joined Mr. Coleman in requesting the pickets to remove the Buick and when they persisted in their refusal to do so he, Coleman, and T. F.'s employees left.

A temporary restraining order was issued on August 10th, which, among other things, enjoined the respondents, their officers, representatives, agents, employees, members and all persons acting in concert with them from picketing at Haberman's Crossing, the contractors' gate or any approach thereto. On August 11th, at about 9:00 a. m., despite the said restraining order, some fifteen of respondents' pickets were stationed at Haberman's Crossing. Present with them were the President and Vice-President of the respondent local. The pickets were stationed in such a position across the roadbed of 49th Street as to block the passage of vehicles along it, but when a contractor's car or truck approached they would shift their positions sufficiently to permit it to proceed.

That morning a car containing four employees of M. W. Kellogg Co., one of the contractors engaged in the construction project, arrived at the contractors' gate. They found about a dozen pickets stationed across the driveway leading to the gate. When one of the pickets told Kellogg's employees that there was a picket line at the plant they refused to enter. Later, however, the pickets withdrew and Kellogg's men entered the plant.

The foregoing incidents, and others disclosed by the record, persuade me that

the charges set forth in the petition have been substantially sustained, and that there is ample basis for the Board's finding that there is reasonable cause to believe that the respondents, their agents and representatives have engaged in, and unless restrained, are likely to continue to engage in acts which are violative of § 8(b)(4)(A) of the Act prior to the Board's determination of the charges filed herein. While the granting of a temporary injunction does not necessarily depend on my so finding, it is my opinion that a coercive intent was implicit in the manner of the picketing, the assembling of large groups of pickets at points very remote from the only entrance to the Phelps Dodge plant, and, more particularly, because of their presence in large numbers at the contractors' gate and their blocking thereof. If their acts and conduct had no coercive intent,—and I believe they had—there appears to be little doubt that they had that effect.

I believe that the respondents, by their aforementioned acts and otherwise, have induced and encouraged the employees of T. F., Munder, Kellogg, and the other contractors involved in the construction project to engage in a concerted refusal in the course of their employment to use, process, transport or otherwise handle or work on goods and materials, or to perform services, and that an object of such acts was to force or require said contractors to cease doing business with Phelps Dodge, thereby interrupting the said construction project and the operations and business of Phelps Dodge.

Local 1976, United Brotherhood, etc. v. National Labor Relations Board, 357 U.S. 93, 99, 78 S.Ct. 1011, 2 L.Ed.2d 1186, cited by the respondents in support of their contention that all secondary boycotts are not prohibited is clearly distinguishable. Their contentions (1) that their efforts were directed at the primary employer, (2) that the investigation by the Board was inadequate, and (3) that the application herein is defective in that the aggrieved party (contractor) is not the charging party, are all without merit.

The cases cited by them to support those contentions are inapplicable.

Accordingly, the application for a temporary injunction as prayed for in the petition, is granted, to be effective until the final determination by the Board of the charges filed by Phelps Dodge.

Submit proposed findings of fact and conclusions of law in conformity herewith.