NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

LOCAL 294, INTERNATIONAL BROTH-
ERHOOD OF TEAMSTERS, CHAUF-
FEURS, WAREHOUSEMEN AND
HELPERS OF AMERICA, and Howard
Bennett, Its Agent, Respondents.

No. 42, Docket 25558.

United States Court of Appeals
Second Circuit.

Argued Dec. 3, 1959.

Decided Jan. 12, 1960.

Clark, Circuit Judge, dissented.

Herman M. Levy, Atty., N. L. R. B., Washington, D. C. (Jerome D. Fenton, Gen. Counsel, Thomas J. McDermott, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Duane B. Beeson, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

Harry Pozefsky, Gloversville, N. Y., for respondents.

Before CLARK, WATERMAN and MOORE, Circuit Judges.

MOORE, Circuit Judge.

The National Labor Relations Board (the Board) petitions for enforcement

of its order against Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union), and Howard Bennett, its agent that they cease and desist from unfair labor practices in violation of Section 8(b) (4) (A) of the National Labor Relations Act (the Act), 29 U.S.C.A. § 158(b) (4) (A). The proceeding was instituted by the Board's General Counsel upon charges filed by Bonded Freightways, Inc. (Bonded). The Trial Examiner found on the facts and the law that the Union and Bennett had violated the section. The Board adopted the findings, conclusions and recommendations of the Examiner (121 N.L.R.B. No. 123).

As is not unusual in these cases the principal difference between the parties arises out of widely divergent interpretations of the facts. On the early morning of January 6, 1958 in Albany, New York, the four truck drivers of the Industrial Molasses Corporation (Industrial) went on strike. The Board argues that the work stoppage was primarily directed at causing Industrial to discontinue its practice of giving its overflow trucking work to Bonded, a company which had an independent union not affiliated with the Union. The Union argues that two truck drivers struck against Industrial because Bonded's drivers were given longer runs and better pay and that the action of the other Union employees in also striking was "spontaneous and self-generated"; that the work stoppage "arose only because of the money difference in the runs"; and that the strike was directed against Industrial and not against Bonded.

The collective bargaining agreement between the Union and Industrial contained the following section (Section 9) relating to subcontracting:

"The Company will not, so long as equipment and personnel are available, contract work which is customarily performed by the employees in the bargaining unit, to any other Company. When necessary to contract work, every effort shall be made to give the work to a contractor who employs members of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers."

Because of the seasonal nature of the business, Industrial was able to handle its June to November deliveries for the most part with its own equipment and employees. From November through May it required additional trucks and for some years had used Bonded. Prior to January 6, 1958 Van Deusen, the Union shop steward, had on several occasions requested Industrial to discontinue its use of Bonded for its overflow work. For economic reasons, "because the rates were lower," Industrial continued with Bonded.

The Examiner has found, and the Board has affirmed the findings, that "the work stoppage of January 6, 1958, was not a spontaneous action of the drivers, but merely the culmination of a long-continued effort by the Union, acting through its plant representative, Van Deusen, to persuade Industrial to cease assignment of overflow hauls to Bonded and give them to a carrier recognized by the Union," and that "the Union's purpose in striking was to compel Industrial to cease doing business with any employer, or employers, of a certain class, i. e., those employing union[1] labor." A review of the testimony discloses substantive evidence in support of these findings and conclusions.

It is true that the event which caused the smoldering fire of resentment to flare up was Van Deusen's discovery that Bonded drivers had been assigned the day's longest hauls. Some of the deliveries to be made were to be hauled into New England and some to New York State points. Bonded, called in to help handle the overflow, was not licensed to transport from Albany into New Eng-

---

1. The Examiner must have been referring to independent union labor or nonteamsters unions.

land. Therefore, Industrial's own drivers had to make the New England hauls, and it so happened that on this day the New England hauls were somewhat shorter than the intra-New York State hauls.

However, in the negotiations which ensued during the day it was not this incident or other minor grievances [2] which predominated in the discussion but rather the use of Bonded for overflow work. The Union agent said that "Bonded was the issue, because they are not a member of the Teamsters organization"; that Industrial was in violation of Section 9; that Industrial "would have to stop doing business with Bonded in order to get back to work"; and that there could be no settlement of the strike unless Industrial complied with this demand. That the primary object of the strike was to compel Industrial to cease doing business with Bonded is demonstrated by the fact that as soon as Industrial capitulated and agreed to use Leaman Transportation Corporation, a company employing Union members, the strike was immediately terminated and work was resumed. Had the real grievance been merely a question of assignment of daily runs negotiations would normally have concerned themselves with this topic. This issue, although a motivating cause of the strike, seems to have been discarded as a major problem and dwarfed by the determination to eliminate Bonded as an overflow carrier.

■■ The fact that other incidental grievances were settled at the same time does not alter the unlawful character of the strike if one of the objects comes within the prohibitions of Section 8(b) (4) (A), as indicated by the fact that the section was amended in conference by striking out the words "for the purpose of" and inserting the clause "where an object thereof is." 93 Cong.Rec. 6850.

N. L. R. B. v. Denver Bldg. & Const. Trades Council, 1951, 341 U.S. 675, 689, 71 S.Ct. 943, 95 L.Ed. 1284; N. L. R. B. v. Wine, Liquor and Distillery Workers, 2 Cir., 1949, 178 F.2d 584, 586, 16 A.L.R. 2d 762. Nor is it a defense to argue that Bonded received some business when Leaman could not handle all the overflow work because complete elimination of the company under attack is not necessary. See Retail Fruit & Vegetable Clerks, Union v. N. L. R. B., 9 Cir., 1957, 249 F.2d 591, 595.

The situation here falls directly within the category of practices which Congress intended to try to abolish by declaring them to be unfair labor practices. H.Conf.Rep. 510, 80th Cong., 1st Sess., page 43; Sen.Rep. No. 105, 80th Cong., 1st Sess., page 22. The Union and its agent engaged in and induced and encouraged a strike to force Industrial to cease doing business with Bonded. Such a strike was in violation of Section 8(b) (4) (A). The Board is entitled to a decree of enforcement of its order.

CLARK, Circuit Judge (dissenting).

Since the underlying facts of this labor dispute are not in doubt, we cannot avoid review of the Board's application of the law to these facts by shielding ourselves under the "substantial evidence" rule. And it seems to me clear that the Board has seriously, quite possibly devastatingly, restricted the right to strike which has been preserved through all the labor acts, § 13, 29 U.S.C. § 163, and has even charted a course for avoiding the limiting provisions of the new Labor-Management Act, which, while outlawing secondary strikes and boycotts, nevertheless recognize the lawfulness of "primary" strikes or picketing. See § 8(b) (4) (B), 29 U.S.C. § 158(b) (4) (B) as amended by Act of Sept. 14, 1959; Ryan, Secondary Boycotts under the New La-

---

2. Saturday hauls, terminal hours, unsafe equipment, terminal assignments and other "little problems" which Van Deusen had not brought up for settlement under the grievance machinery provided for in the bargaining agreement were also discussed. The Examiner was "satisfied that these grievances were not the cause of the work stoppage, but merely an accumulation of minor grievances which the union representatives brought up during the conference over the main problem of the use of Bonded trucks, in order to get them all settled at one sitting."

bor-Management Reporting and Disclosure Act of 1959, 34 St.John's L.Rev. 42, 52–55. The potential ramifications of this program, now validated by us, cannot yet be fully foreseen; but it would seem operable by the mere labeling of a dispute—no matter how far-reaching in its effect upon a union and its members—as merely "secondary." And the machinery may be set in motion, notwithstanding settlement of differences by employer, employees, and representing union, upon application to the Board by a nonunion competitor, such as Bonded here, which naturally has lost ground upon the strike settlement.

Consider the nature of the present dispute and the particular circumstances which brought it to white heat. Both the Board and my brothers discount the happenings at 3 a. m., January 6, 1958, at the Albany plant of the employer (the *situs* of the dispute for heretofore permissible picketing or strike, see Ryan, supra) when the strike began. Of course this aspect of the dispute was not the whole story, but it was a dramatic culmination of a long-standing grievance which is not to be overlooked. For the Union truck drivers then found that the really desirable runs that day in terms of length and better pay were being given (in violation of the collective bargaining agreement between the Union and the employer) to the drivers of Bonded, a company which had an independent union not affiliated with the respondent Union. This had happened before and seems to me to go to the heart of the labor relations here between employer and employees and their union. The labor practice thus indulged in violated all rules of seniority established for this business, and it gave a preference in terms of cold cash to independent truckers. The explanation given—and accepted by my brothers—seems both true and naive in terms of actualities of labor struggles, viz., that the employer would thus save money and Bonded could not be otherwise used, since it (conveniently) was not licensed for the shorter hauls. If the Union was to preserve

its existence and any potential power to represent its men, it surely must fight this. What else could it do? Its very existence at this plant was at stake; for as matters now stand the advantage in position and pay is given the independent truckers. So the strike appears inevitable, and the settlement taking away this preference from Bonded quite natural. The decision here overturning all this and solidifying the preference to the nonunion competitor, I suggest, therefore, is one to give concern to all interested in the development of peaceful labor relations in this country.

I would deny enforcement of the Board's order.