Bernard SAMOFF, Acting Regional Director of the Fourth Region of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Local 1694, International Longshoremen's Association, and James T. Moock and Clifford Carter, their Agents, Respondents.

Civ. A. No. 2245.

United States District Court
D. Delaware.
Oct. 14, 1960.

**310**

Stuart Rothman, Dominick L. Manoli, Winthrop A. Johns, Joseph I. Nachman, Washington, D. C., Leonard Leventhal, Philadelphia, Pa., and Marvin Roth (of the National Labor Relations Board), Washington, D. C., for petitioner.

Abraham E. Freedman and Marvin I. Barish (of Freedman, Landy & Lorry), Philadelphia, Pa., for respondents.

Arthur J. Sullivan (of Morris, James, Hitchens & Williams), Wilmington, Del., for Board of Harbor Commissioners.

STEEL, District Judge.

1. The petitioner is Bernard Samoff, Acting Regional Director of the Fourth Region of the National Labor Relations Board, an agency of the United States. The respondents are International Longshoremen's Association, Local 1694 of the International Longshoremen's Association, and their business representatives, James T. Moock and Clifford Carter.

2. Respondents ILA and Local 1694 are both incorporated associations. They are organizations in which employees participate and they exist for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment or conditions of work. They are labor organizations within the meaning of Secs. 2(5), 8(b) and persons within the meaning of Sec. 10(*l*) of the Labor Management Relations Act, 1947, as amended, Sept. 14, 1959.[1] Respondents Moock and Carter are agents of respondents ILA and Local 1694 within the meaning of Secs. 2(13),[2] 8(b) and 10(*l*) of the Act.

3. Respondent Local 1694 maintains its principal offices in Wilmington, Delaware, and all respondents are engaged within this judicial district in transacting business and promoting and protecting the interests of the employee members of respondents ILA and Local 1694, and employee members of constituent and affiliated labor organizations.

4. The Board of Harbor Commissioners is a political subdivision of the City of Wilmington, Delaware, and is engaged in the operation of a pier and other facilities at the Marine Terminal, Wilmington, Delaware, for the docking of vessels, and the loading and unloading of commodities shipped by means of waterborne conveyances. During the past year, the Harbor Commissioners have received revenue in excess of $100,000 for the wharfage of vessels, for the handling of goods discharged from vessels which had transported the goods from foreign countries and from States other than Delaware, or for goods loaded aboard vessels destined for foreign countries, or for other points outside of Delaware.

5. Norton, Lilly & Co. ("Norton") is engaged at the Marine Terminal in Wilmington, Delaware, and elsewhere, as agents for shipping companies and ship owners, and on behalf of its principals performs services required by ships while docked at the Marine Terminal, Wilmington, Delaware.

---

1. 29 U.S.C.A. §§ 152(5), 158(b), 160(*l*).

2. 29 U.S.C.A. § 152.

6. Murphy, Cooke & Co. ("Murphy") is engaged at the Marine Terminal, Wilmington, Delaware, and elsewhere, in performing stevedoring services.

7. Transit Freeze Corporation ("Transit") is engaged in the operation of a frozen foods storage facility which it leases from the Harbor Commissioners. The storage facility is located on the docks at the Marine Terminal, Wilmington, Delaware.

8. On or about August 22, 1960 the S. S. Pipiriki arrived at the Marine Terminal, Wilmington, Delaware, with a cargo of frozen meat to be unloaded at the Terminal and transported to and stored in the facilities of Transit.

9. Prior to the arrival of the Pipiriki, its owners engaged Norton, as ship's agent, to make the necessary arrangements for the discharge of the cargo and for such other services as the vessel might require while at the Marine Terminal.

10. Norton thereupon arranged with Murphy to provide the stevedoring services for discharging the cargo from the ship's hold onto the dock along side of the vessel. Murphy assigned this work to employees who are members of, or represented by, respondents ILA and Local 1694.

11. The Harbor Commissioners assigned to its own employees, who are members of, or represented by, Local 107, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, all of the work involved in moving the meat from shipside to Transit's freezer.

12. Prior to the arrival of the Pipiriki, the respondents demanded of Murphy, in the presence of a representative of the Harbor Commissioners, that members of Local 1694 be given the work involved in moving the meat from shipside to the freezer facilities. This demand was refused.

13. In furtherance and support of the demand stated in Finding of Fact 12, respondents instructed their members employed by Murphy not to unload the Pipiriki, and as a result, they refrained from doing so.

14. On or about August 24, 1960 the Harbor Commissioners filed a charge with the Board alleging a violation of Secs. 8(b) (4) (B) of the Act. On or about August 27, 1960 petitioner, to whom the charge had been referred, filed a petition alleging the violation of Sec. 8(b) (4) (B) and seeking a temporary restraining order and an injunction under Sec. 10(l) of the Act pending a final adjudication by the Board of the validity of the charge.

15. On August 27, 1960 a temporary restraining order was issued which, in effect, enjoined respondents from refusing to unload the Pipiriki's cargo. Respondents thereupon caused the meat to be unloaded from the hold and to be deposited on the dock from whence it was transported to Transit's freezer by employees of the Harbor Commissioners who are members of or represented by Local 107.

16. There is, and petitioner has, reasonable cause to believe that:

(a) Respondents have engaged in or have induced and encouraged members of the ILA and Local 1694 employed by Murphy to engage in a strike or refusal in the course of their employment to transport or otherwise handle materials or commodities or to perform services and have threatened, coerced and restrained Murphy, Norton, and the Harbor Commissioners.

(b) The purpose and object of such activities was to force or require Norton, as agent for the owners of the Pipiriki, to cease doing business with the Harbor Commissioners; to force or require Transit to cease doing business with the Harbor Commissioners; and to force or require Murphy to cease doing business with Norton. The acts and conduct of the respondents aforesaid have a close, intimate and substantial relation to trade, traffic and commerce among the several states and tend to lead to and do lead to labor disputes burdening and obstructing commerce and the free flow of commerce.

(c) It may be fairly anticipated that, unless enjoined, respondents will continue and repeat, with respect to vessels other than the Pipiriki, the acts and conduct set forth in Finding of Fact 13 or similar or like acts and conduct.

### Conclusions of Law.

1. Under Sec. 10($l$) this Court has jurisdiction of the parties and of the subject matter of this action, and is empowered to grant injunctive relief.

2. There is, and petitioner has, reasonable cause to believe that:

(a) Respondents International and Local 1694 are labor organizations within the meaning of Secs. 2(5), 8(b) and persons within the meaning of Sec. 10($l$) of the Act.

(b) Norton, Murphy and the Harbor Commissioners are each engaged in commerce within the meaning of Sec. 2(6) and (7) [3] of the Act.

(c) At the time when this action was begun and prior to the issuance of the restraining order on August 27, 1960 respondents were engaged in, and unless they are enjoined pending a final adjudication of the controversy by the Board, they will repeat and continue to engage in, activities in violation of Sec. 8(b) (4) (B) of the Act, and a continuation of these practices and activities will impair the policies of the Act as set forth in Sec. 1(b) [4] thereof.

(d) To preserve the issues for the orderly determination by the Board as provided in the Act, it is appropriate, just and proper that, pending the final disposition of the matters herein involved pending before the Board, respondents, their officers, representatives, agents, servants, employees, attorneys, and all members and persons acting in concert or participation with them, be enjoined and restrained from the commission, continuation, or repetition, of the acts and conduct set forth in Finding of Fact 12 above, acts or conduct in furtherance or support thereof, or like or related acts or conduct the commission of which in the future is likely or may fairly be anticipated from respondent's acts and conduct in the past.

### Discussion.

In this Sec. 10($l$) [5] proceeding, the Court is not required to determine definitively whether an unfair labor practice has occurred. Its duty is to decide only whether the petitioner has reasonable cause to believe that it has occurred. Schauffler v. Highway Truck Drivers Union, 3 Cir., 1956, 230 F.2d 7, 9; Shore For and on Behalf of N. L. R. B. v. Building & Construction Trades Council, 3 Cir., 1949, 173 F.2d 678, 681, 8 A.L.R.2d 731. Resolution of the actual merits of the controversy must be left for administrative determination by the Board, subject to subsequent review by the Court of Appeals if enforcement is sought. American Federation of Radio and Television Artists v. Getreu, 6 Cir., 1958, 258 F.2d 698, 699.

The dispute which gives rise to this action stems from the introduction of a new type of operation by Transit at the Marine Terminal. Transit proposes to operate a freezing unit for meats on the pier under lease from the Harbor Commissioners. The lease is silent as to who shall perform the work required in removing meat from the holds of vessels and transmitting it to the freezer.

Respondents assert that ILA labor is entitled to perform all of the work involved in unloading meat from the hold of the vessel and delivering it to the freezer, including the interim coopering.[6] The Harbor Commissioners claim that after the meat has been discharged at shipside by ILA labor, the Harbor Commissioners are entitled to cause the meat to be transported to the freezer

---

3. 29 U.S.C.A. § 152(6, 7).

4. 29 U.S.C.A. § 141(b).

5. 29 U.S.C.A. § 160($l$).

6. Coopering consists of breaking open the packages of meat so that they can be inspected by the Government and repackaging the meat following the inspection. This occurs before the meat is placed in the freezer.

and to perform the coopering services, by means of their own employees who are members of Teamsters Local 107.

Upon the arrival of the S. S. Pipiriki at the Marine Terminal with a cargo of meat destined for the freezer, members of the ILA refused to discharge the cargo from the hold to shipside at the request of Murphy, the stevedoring company which had been employed by Norton, the ship's agent, for that purpose.

Respondents are charged with violating Sec. 8(b) (4) (B).[7] This makes it an unfair labor practice for a labor organization or its agents to encourage any individual employed by any person engaged in commerce to engage in a strike or refuse to handle goods or perform services in the course of such individual's employment, or to coerce any person engaged in commerce, where a purpose of such actions is to force any person to cease doing business with any other person.[8] That respondents encouraged members of the ILA to refuse to discharge the meat cargo from the Pipiriki for their stevedoring employer, Murphy, and that such action was coercive, is plain. Nor is there any doubt that respondents' conduct brought about a cession of business between (1) Murphy and Norton, the agent for the Pipiriki, (2) Norton and the Harbor Commissioners, and (3) the Harbor Commissioners and Transit, the freezing unit operator. If one of respondents' objectives was to bring about the termination of these business relationships and the refusal of the ILA membership to work the Pipiriki occurred in the course of their employment, then it is clear that the union's conduct fell squarely within

the terms of Sec. 8(b) (4) (B), unless respondents are protected by the *proviso* of that section which reads:

"Provided, That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing."

■ Sec. 8(b) (4) (B) is directed against the secondary boycott. N. L. R. B. v. Denver Building & Construction Trades Council, 1951, 341 U.S. 675, 686, 71 S.Ct. 943, 95 L.Ed. 1284.[9] The secondary boycott at which it is aimed is the coercion of neutral employers, themselves not concerned with the primary labor dispute, through the inducement of their employees to engage in strikes or concerted refusals to handle goods. Local 1976, United Broth. of Carpenters and Joiners of America v. N. L. R. B., 1958, 357 U.S. 93, 100, 78 S.Ct. 1011, 2 L.Ed.2d 1186.

Respondents assert that in encouraging the ILA membership to refuse to discharge the Pipiriki, they were acting primarily against Murphy and Norton for the purpose of enforcing a collective bargaining agreement which the ILA had with them. Their dispute, they say, was with Murphy and Norton and not with the Harbor Commissioners. This argument rests upon the terms of a collective bargaining agreement between the Philadelphia Marine Trade Association ("PMTA") and the ILA. The agreement covers the employment relationship between th ILA International and certain of its Locals, including Local 1694, and the shipping industry members of PMTA in port areas which included Wilmington,

---

7. The petition also charges a violation of Sec. 8(b) (4) (D), 29 U.S.C.A. § 158 (b) (4) (D). In the Supplemental Memorandum of Points and Authorities after Trial filed by petitioner, the statement is made in fn. 1:

   " * * * Since the institution of this proceeding the parties involved agreed upon a method for the adjustment of the dispute which was the basis for the alleged Section 8(b) (4) (D) violations, and the charges filed with the Board, in-

sofar as they relate to that aspect of the case, have been withdrawn. * * * "

8. 29 U.S.C.A. § 158(b) (4) (B).

9. The Court had before it Sec. 8(b) (4) (A) of the Labor Management Relations Act, 1947. After amendment in 1959 that Section became, in substantial part, Sec. 8(b) (4) (B), so that the Denver building case and other pre-1959 cases cited infra in this opinion are pertinent in the context of this case.

**314**

Delaware. Murphy and Norton are members of PMTA and as such are parties to the agreement. The Harbor Commissioners are not members of the PMTA and are not parties to the agreement. The agreement provides in part:

> "The Employer-members of the Association agree that they will not directly perform work done on a pier or terminal or contract out such work which historically and regularly has been and currently is performed by employees covered by this agreement or employees covered by ILA craft agreements unless such work on such pier or terminal is performed by employees covered by ILA agreements."

Under the arrangement between the Harbor Commissioners and Norton it was contemplated that Norton would cause the cargo to be discharged from the hold of the Pipiriki and deposited upon the dock alongside of the vessel; and that the Harbor Commissioners would perform all services required for the transmission of the cargo to the freezing unit, including interim coopering, through its own employees who were members of Teamsters Local 107. The respondents contend that the work which the Harbor Commissioners propose to assign to Local 107 is work which had been performed "historically and regularly * * * and currently" by ILA labor; and that under the collective bargaining agreement between PMTA and the ILA, Murphy and Norton are contractually bound to refuse to discharge the Pipiriki's cargo if pier services are performed by Local 107.[10] The primary purpose of the strike, the respondents say, was to bring economic sanctions to bear upon Murphy and Norton to compel them to abide by the terms of their agreement with the ILA, and that any resulting interference with the business relations between Murphy and Norton, Norton and the Harbor Commissioners and the Harbor Commissioners and

Transit, was simply a by-product of that primary objective.

A complete answer to this contention is found in Local 1976, United Broth. of Carpenters v. N. L. R. B., 1958, 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed.2d 1186. There, a carpenters' union had induced its members to strike against their employer, a general contractor, because he sought to have the carpenters work on doors manufactured by a third party with non-union labor. When the union was charged with violating Sec. 8(b) (4) (A),[11] it defended upon the ground that it had a collective bargaining agreement with the general contractor which provided that the union carpenters should not be required to handle non-union material, and hence the refusal of the carpenters to work on the non-union doors had contractual authorization. The Court rejected this argument and sustained the finding by the Board that the union's action constituted a secondary boycott against the manufacturer of the doors. Insofar as the PMTA contract barred Murphy and Norton from performing services at the terminal in conjunction with Local 107 labor, it is indistinguishable from the "hot cargo" contract involved in the United Broth. of Carpenters case. Douds on Behalf of N. L. R. B. v. Sheet Metal Workers Ass'n, Local 28, D.C.E.D.N.Y.1951, 101 F.Supp. 273, which respondents urge in support of their contention that the respondents' refusal to work was permissible primary activity, was decided prior to the United Broth. of Carpenters case and is irreconcilable with it.

The fact that the Harbor Commissioners, the primary object of the respondents' action, and Murphy and Norton, the secondary source through which the primary pressure was applied, were simultaneously engaged in the same general venture at the same location, does not place respondents' activity outside of the secondary boycott category. International Broth. of Electrical Workers, Local 501, A. F. of L. v. N. L. R. B., 2 Cir.,

10. This will be assumed to be true, but no Finding is made with respect to the point.

11. See note 9, supra.

1950, 181 F.2d 34, 37, affirmed, 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299.[12]

Whether Moock, the ILA vice president, told Cartwright, the manager of the Marine Terminal, that the ILA longshoremen would not work the Pipiriki unless they obtained all of the pier work, is the subject of conflicting testimony. It is not necessary to resolve this conflict. Union activity can attain secondary boycott status even though no communication takes place between the union and the employer who is the primary target. This is the plain implication of the United Broth. of Carpenters case; for so far as appears, the striking union never had any contact with the non-union manufacturer. Yet the Court held that the strike was primarily directed against the manufacturer and was "unquestionably" a violation of the secondary boycott provisions of the Act (357 U.S. at page 101, 78 S.Ct. at page 1017). N. L. R. B. v. Local 294, International Bhd. of Teamsters, 2 Cir., 1960, 273 F.2d 696 and International Brotherhood of Electrical Workers, Local 501, A. F. of L. v. N. L. R. B., 2 Cir., 1950, 181 F.2d 34, affirmed, 1951, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 are additional cases which hold that conduct by a union may constitute a secondary boycott in violation of the Act, even though the evidence fails to disclose a dispute having active manifestations between the union and the primary employer.

Respondents say that Murphy does not stand in a position of a neutral and that this is prerequisite to a finding that respondents' action was aimed secondarily at it. It is impossible to distinguish the basic nature of Murphy's relationship with the ILA from that which the general contractor bore to the carpenters union in the United Broth. of Carpenters case. There, as here, it was the alleged breach of the collective bargaining agreement by the employer which the union claimed gave rise to the labor dispute between the union members and their employer. Despite the antagonism thus engendered, it was ineffective to deprive the employer of the status of a "neutral" in United Broth. of Carpenters, and no reason appears why it should have any different effect in the case at bar.

Respondents claim that it was the prerogative of Norton or Murphy to assign to labor of their choice all of the pier work up to the point of final rest for the cargo, which respondents say was the freezer door, and that the Harbor Commissioners were acting without right when they sought to restrict the ILA to discharging the cargo at shipside and to assign to Local 107 the remainder of the work. Reliance is placed upon the asserted custom in Philadelphia and Wilmington for ILA labor to carry cargo to its last place of rest, the legal responsibility of the shipper to deliver cargo to its consignee, the provisions of the statute under which the Harbor Commissioners were created, and the rules and regulations under which they operate. The respondents contend that if, as it asserts, control of the assignment of the pier work reposes in Norton and Murphy and not in the Harbor Commissioners, then, of necessity, the primary objects of the union's action must have been Norton and Murphy and not the Harbor Commissioners. The premise of the argument that Norton and Murphy are legally entitled to control all work on the pier may be accepted arguendo. But the conclusion does not follow that Norton and Murphy must therefore be the primary targets of respondents' actions. It is as logical to suppose that the ILA would attempt to bring pressure to bear on the Harbor Commissioners if they were acting wrongfully in assigning the work to Local 107 as it is if they were acting rightfully in making the work assignment. Whether the Harbor Commissioners were right or wrong in giving part of the pier work to Local 107, it is indisputable that this work assignment was the basic obstacle to Murphy getting the work for ILA labor. The petitioner had a rational basis for believing that

12. See note 9 supra.

when the ILA refused to work the Pipiriki, one of its primary objectives was to put the squeeze on the Harbor Commissioners by cutting off business relations between Murphy and Norton and between the Harbor Commissioners and Norton and Transit so as to compel the Harbor Commissioners to give all of the pier work to Murphy, and through him, to ILA labor. The illegality of the Harbor Commissioners' assignment of work to Local 107—if such assignment was illegal—is no justification for union retaliation by means of a secondary boycott. Cf. Superior Derrick Corp. v. N. L. R. B., 5 Cir., 1960, 273 F.2d 891, 893.

■ It is unnecessary to determine whether, as respondents argue, the Harbor Commissioners have in the past permitted users of the terminal facilities to provide all of the labor needed to transport cargo to its final place of rest, or whether, if such practice prevailed, the Harbor Commissioners are presently discriminating in favor of Local 107 in violation of the provisions of the Shipping Act. 46 U.S.C.A. § 815. The present proceeding is by a Governmental agency seeking injunctive relief in the public interest. Douds v. Wood, Wire and Metal Lathers International Ass'n, etc., 3 Cir., 1957, 245 F.2d 223, 225. Consequently there is no room for the application of the doctrine of unclean hands. Cf. N. L. R. B. v. Kingston Cake Co., 3 Cir., 1953, 206 F.2d 604, 611.

■ Whether the refusal of the ILA to work the Pipiriki occurred in the course of the employment of its members—a condition which is indispensable to Sec. 8(b) (4) (B) violation—remains to be considered.

The Pipiriki docked at 5:45 on August 22. At 8:00 the following morning the longshoremen appeared prepared to work. Because of Moock's inability to secure an agreement for all of the pier work which he wanted, the longshoremen refused to work the Pipiriki. From this, respondents argue that the longshoremen's refusal to work did not occur in the course of their employment. At the time, the agreement between Norton and Murphy, as members of the PMTA, with the ILA International and Local 1694 was operative. In substance, it required Murphy and Norton to employ ILA longshoremen for the performance of any services on the Wilmington pier. While the agreement did not expressly say that the longshoremen would be obligated to perform such services, this is the clear implication of the agreement. Moreover, ILA personnel customarily performed services on the pier in Wilmington as well as on the ships which docked there.[13] The concept of activities "in the course of employment" may have different meanings under different circumstances and for different purposes, but to construe the expression in Sec. 8(b) (4) (B) so as to exculpate respondents would deprive the Section of much of the effectiveness which the Congress intended it should have. Upon evidence not significantly different from that at bar, it was held in United Marine Division, Local 333, ILA, 107 N.L.R.B. 686 (1954) that a sufficient employment relationship existed to bring the forerunner of Sec. 8(b) (4) (B) into play.[14] Joliet Contractors' Ass'n v. N. L. R. B., 7 Cir., 1953, 202 F. 2d 606, relied upon by respondents to support an opposite conclusion, was considered and found to be without perti-

---

13. In Respondents' Brief in Opposition to the Petition for Injunction, it is stated at p. 25:

"* * * *In limine*, it must be noted that in the Wilmington Marine Terminal, ILA personnel have historically performed various services on the piers as well as on the ships. * * * Many commodities have been trucked over the Wilmington piers to a final place of rest by longshoremen represented by Local 1964 * * * The record shows that in the discharge of the various cargoes arriving at the Harbor Commissioners' facilities, the cargo was taken by ILA labor to a final place of rest on the pier, sometimes several hundred feet from the vessel."

14. See note 9 supra.

nence. In pointing out critical factual distinctions between the situation before it and that involved in Joliet, the Board said at p. 709:

> " * * * Here we have an already established arrangement and course of employment under which longshoremen are expected to make themselves available on a regular basis for work assignments each morning work is to be done, and the employing stevedoring contractor or steamship company is expected, and indeed required, to give such longshoremen first call on such work as is available. That the relationship is regarded by both the employees and the employers, not merely as an intermittent one, broken at the end of each day's work, but one having an established and continuing character, at least as between employees and those employers collectively who are related together in membership in the Shipping Association, is, I believe, amply evidenced by the collective-bargaining agreement with its provisions for vacation pay, welfare benefits, and the like. * * * "

Largely comparable, although not identical, facts exist in the present action. In American Federation of Radio and Television Artists v. Getreu, 6 Cir., 1958, 258 F.2d 698 the Court had before it an appeal from the issuance of an injunction under Sec. 10($l$) wherein the union argued that the requisite employment relationship to support the charge was lacking. The Court stated that unless nothing short of a continuous employment relationship would meet the requirement of the Act, which it refused to hold, the Board should be allowed to determine whether the situation was more akin to longshoremen's cases such as United Marine Division, Local 333, etc., supra, than it was to the Joliet case. Petitioner had reasonable cause to believe that a sufficient employment relationship existed at the time when the longshoremen refused to discharge the Pipiriki's cargo to bring the conduct of respondents under the ban of Sec. 8(b) (4) (B).