**RETAIL CLERKS UNION LOCAL 770, RETAIL CLERKS INTERNATIONAL ASSOCIATION, AFL–CIO, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

United States Hardware and Paper Company, Wesco Merchandise Company, and Food Employers Council, Inc., Intervenors.

**No. 15862.**

United States Court of Appeals District of Columbia Circuit.

Argued March 2, 1961.

Decided July 6, 1961.

Petition for Rehearing Denied Aug. 23, 1961.

Mr. Tim L. Bornstein, Washington, D. C., with whom Mr. S. G. Lippman, Washington, D. C., was on the brief, for petitioner.

---

1. Best v. District of Columbia, 291 U.S. 411, 415, 54 S.Ct. 487, 78 L.Ed. 882 (1934); Stuthman v. United States, 67 F.2d 521, 523 (8 Cir., 1933).

Mr. Melvin J. Welles, Washington, D. C., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Stuart Rothman, Gen. Counsel, N. L. R. B., Mr. Dominick L. Manoli, Associate Gen. Counsel, N. L. R. B., and Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, N. L. R. B., were on the brief, for respondent. Mr. Melvin Pollack, Atty., N. L. R. B., also entered an appearance for respondent.

Miss Helen F. Humphrey, Washington, D. C., for intervenors United States Hardware and Paper Co. and Wesco Merchandise Co.

Mr. Joseph C. Wells, Washington, D. C., for intervenor Food Employers Council, Inc. Messrs. Gerard D. Reilly and Lawrence T. Zimmerman, Washington, D. C., were on the brief for intervenor Food Employers Council, Inc.

Messrs. David E. Feller and Jerry D. Anker, Washington, D. C., filed a brief on behalf of The Industrial Union Department, AFL-CIO, as amicus curiae.

Before Mr. Justice REED, retired,* and PRETTYMAN and BAZELON, Circuit Judges.

PRETTYMAN, Circuit Judge.

This case is before us on a petition by Retail Clerks Union Local 770 to review an order of the National Labor Relations Board and on a cross-petition by the Board for enforcement of that order. The Board found that certain work stoppages by members of the Union violated both clause (A) and clause (B) of Section 8(b) (4) of the National Labor Relations Act.[1]

Local 770 is the bargaining representative for the clerks in a number of retail food markets in southern California. It had a collective agreement with Food Employers Council, Inc. (hereinafter "Council"), an association of market employers. Certain wholesale distributors, known in the trade as "rack-jobbers", who handle chiefly non-food or specialty items, not only sell their products to the markets but also provide "driver-salesmen", or "roving clerks", to arrange their wares on the market shelves and to rotate, replenish and clean the displays. The Union claims that this work done in the markets by these employees of the rack-jobbers belongs to the Retail Clerks and it is a violation of the collective bargaining agreement for the employers to permit others to perform it.

One work stoppage occurred when two agents of the Union called out the clerks employed at Hughes Market in Hollywood. The clerks were not permitted to return to work until merchandise supplied by U. S. Hardware & Paper Co., a rack-jobber, was removed from the market's shelves or covered with paper. A similar incident occurred at Boys' Market in Pasadena. The employees of U. S. Hardware were not represented by the Retail Clerks Union.

The Board held that the work stoppages violated Section 8(b) (4) (A) and (B) of the Act because objects of the stoppages were (1) to force the markets to cease doing business with U. S. Hardware and (2) to force U. S. Hardware to recognize Local 770 as the bargaining agent for its employees.

The collective bargaining agreement between Local 770 and the Council contains two clauses relevant to this litigation:

"Article I

"Recognition of the Union

"A. * * *

"B. Work Performed.

"All work performed on the premises in the nature of work generally performed by retail clerks shall only be performed by employees in the bargaining unit as herein defined.

"C. Sub-Contracting or Assignment of Work.

"1. The Employers shall not subcontract any work ordinarily performed by retail clerks in the stores

---

* Sitting by designation pursuant to 28 U.S.C. § 294(a).

1. 61 Stat. 141 (1947) (amended Sept. 14, 1959, 73 Stat. 542, 29 U.S.C.A. § 158 (b) (4)).

or markets of the Employers, and, further, any future work created by the Employer within the Employer's stores or markets which would ordinarily be performed by retail clerks, shall be performed only by members of the bargaining unit as herein set forth, except that such work may be sub-contracted to an employer who is signatory to an Agreement with the Union."

The Union argues that the sole object of the work stoppages was to force the markets to comply with B, the "clerks' work" clause, and to preserve the work in question for members of the bargaining unit. Thus considered, the Union says, the strikes would be legal. The Board argues here, however, that the real object of the stoppages was to insure that this work was done by employees who were members of the Union, regardless of whether they were employees of the markets. The Board points to C, which allows the markets to subcontract under certain circumstances, and to the fact that the Union raised no objection when Council members did business with rack-jobbers who were organized by the Retail Clerks Union. Thus considered, the Board says, the strikes would be illegal.

While there may be arguments as to the precise meaning of the contract clauses above quoted, certain things are clear. First, it is clear the Union had a dispute with the market owners; the subject of the dispute was the employment rights of Retail Clerks Union members in the markets; it was in support of this dispute that the Union called work stoppages; the stoppages were at the markets. These basic facts pose difficult problems of inference. Second, the contract must be read as a whole, and the final "except" clause in section C is an effective exception to the right of the employees in the bargaining unit to certain

work. The "except" clause indicates quite clearly that the employers may sub-contract work (i. e., whatever "such work" in the contract means) to another employer if the latter has an agreement with this Union. The argument that section B, giving the market clerks the right to this work, can be read and enforced separately from all else in the contract, and thus independently of the "except" clause, is untenable. Third, in dealing with their employers the market employees who engaged in the work stoppages did not claim for themselves an absolute and unqualified right to the work being performed in the markets by employees of the rack-jobbers. Neither did the Union claim such an exclusive right for its members who were employed by the markets. The Union made clear throughout its dispute with the markets, and makes clear here, that its claims would have been satisfied by (1) an arrangement whereby the delivery personnel of the rack-jobbers would leave their wares at the receiving decks of the markets or (2) an arrangement whereby employees of the rack-jobbers who delivered to the market shelves, cared for the delivered goods, etc., would be members of the Retail Clerks Union. The claim was, in essence, that this work belonged to the market employees *unless* it were performed by employees of rack-jobbers who were under contract with the Retail Clerks Union. To put it in other words, the work was being claimed for members of the Union in general and not merely for those employed by the markets. This view of the Union's claim in the dispute with the employers was the conclusion reached by the Examiner and adopted by the Board, and it was clearly supported by substantial evidence.

 As we have said, the Board concluded that the Union violated both clause (A) and clause (B) of Section 8 (b) (4) of the statute.[2] Each of these

---

2. Section 8(b) (4) (A) and (B), at the time this proceeding arose, read:
· "(b) It shall be an unfair labor practice for a labor organization or its agents—

\* \* \* \* \*

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment

clauses is descriptive of "an object" which renders it illegal to induce employees of any employer to engage in a concerted refusal to handle goods or to perform services. But the clauses are quite different. The "object" here pertinent described in clause (A) is the forcing of any person to cease doing business with any other person. The "object" described in clause (B) is the forcing of any other employer to recognize an uncertified representative of his employees. The crucial question with respect to the violation of clause (A), as found by the Board, is whether "an object" of the stoppages was to force the market owners to stop doing business with the rack-jobbers.

It is clear, from what we have said of the Union's demands and of the provisions of the contract, that compliance with those demands did not *necessitate* discontinuance of seller-purchaser relationships between the market-owners and the rack-jobbers who had not been organized by this Union. There were apparently three alternative moves by which the markets could have been relieved from the pressure exerted by the Union: (1) let the rack-jobbers leave their goods at the delivery decks; (2) the rack-jobbers to recognize and bargain with the Union; or (3) the markets and rack-jobbers to cease doing business with each other. A discontinuance of the business was at most an alternative that may possibly have satisfied the Union.

We are unable to determine from the Board's opinion the reasoning it followed in reaching its conclusion that an object of the strikes was to force the market owners to cease doing business with the

rack-jobbers. The Board had this to say by way of explanation of its conclusion:

"1. We agree with the Trial Examiner that Local 770 violated Section 8(b) (4) (A) through the inducement of the Boys' Market and Hughes Market employees to engage in a work stoppage in order to bring pressure on members of the Council to cease handling products which were to be placed on the food market shelves by driver-salesmen who were not members of the Clerks. * * * By engaging in work stoppages to enforce the agreement, Local 770 was attempting to ban from the market premises all driver salesmen whom it did not represent. Its object, in effect was to interfere with the practice of the markets of buying from the distributors on a delivered basis. * * * This is a type of secondary boycott, referred to as a product or service boycott, which the Board uniformly proscribes."

To us the foregoing statement is confused both in legalisms and from the factual standpoint. The statute speaks of forcing a person to cease handling the products of any other "producer, processor, or manufacturer," *or* to cease doing business with "any other person". Of course, if the other person is a manufacturer, to cease handling his products would in all likelihood be to cease doing business with him; in such event, either or both of the two clauses in the statute would be applicable. But, if this other person is a merchandiser—not a producer, processor or manufacturer,—the refusal-to-handle clause, specific in its reference to those three classes of persons, does not apply; in such a case the

---

to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing or requiring any employer or self-employed person to join any labor or employer organization or any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products

of any other producer, processor, or manufacturer, or to cease doing business with any other person; (B) forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9; * *."

cease-doing-business clause would apply. In the case at bar the other persons are merchandisers, "jobbers". So far as the record shows, they are not producers, processors or manufacturers of the goods they sell. The Examiner put the activity of the Union under the cease-doing-business clause. The Board, in the quoted statement, says it agrees with him but nevertheless says the pressure was to cause the markets to cease handling the products delivered by the rack-jobbers. Why the Board made this change in conclusion we do not know. The cease-handling-products clause does not apply to jobbers who are no more than jobbers. The attempt by the Board to equate the two clauses is confusing as a matter of legal construction. The Board identifies this case with products boycotts, which surely involve manufacturers. The reason for this attempt at identification does not appear.

The considerations which make material to this controversy the foregoing somewhat academic discussions are the factual features of the case. From the factual viewpoint it would appear unrealistic, at least as a first impression, to conclude that the Union sought to force the markets either to cease doing business with the rack-jobbers or to cease handling the products of the rack-jobbers. The striking employees were store clerks; they wanted to handle these goods; they wanted the employment and the pay which flowed from handling the goods. If the markets ceased doing business with the rack-jobbers or ceased handling these products of the rack-jobbers, there would be no work. These employees are not refusing to handle goods; they want to handle them; at least one emphatic phase of their dispute with the markets is that they (the market employees) are not permitted to handle them. Evidence may contravene or modify this impression, but the findings should be made clear.

We think that on this record this case cannot be fitted into molds designed for cases involving refusals to handle goods. Thus in the Sand Door case [3] the strike was a refusal by employees of a construction contractor to handle for him doors manufactured by a non-union manufacturer. The Court of Appeals for the Ninth Circuit held [4] that the primary dispute there was with the door manufacturer, and from that premise it fashioned its answer to the problem. The Supreme Court did not disturb—indeed it did not comment upon—that view. But in the case at bar the Union had no dispute whatsoever with the producers, processors or manufacturers of the multitudinous items merchandised by the rack-jobbers. In Sand Door a characteristic of the manufacturer of the goods was the focal point of the dispute. In the case at bar the dispute in no way related to the producers, processors or manufacturers.

With these differences in legal aspects and in factual actualities, we think the rules applicable to boycotts of goods cannot be automatically applied here. Perhaps some similar considerations may apply, but the Board does not make clear its position in this respect.

It may be that to force an employer to change his method of doing business with another would be to force him to cease doing business within the meaning of the clause we are now discussing, i. e., clause (A) of Section 8(b) (4). Certainly, however, every change in method is not equivalent to a cessation. If it be held as a matter of law that a rearrangement of methods of doing business may possibly constitute a cessation of business within the meaning of this Section, each case must depend upon its own facts. Rearrangements or changes may be minor or major, or part way between these extremes. A change may be so minor as not to affect the flow or nature of the business. On the other hand a change in

3. Local 1976, United Brotherhood of Carpenters and Joiners of America v. N. L. R. B., 357 U.S. 93, 78 S.Ct. 1011, 2 L.Ed. 2d 1186 (1958).

4. National Labor Relations Board v. Local 1976, Etc., 9 Cir., 241 F.2d 147 (1957).

method may be so drastic as to constitute, or necessarily cause, complete cessation of the business.

And it may also be that every alternative means of satisfying a Union's demands is to be deemed an "object" within the meaning of that Section. Of course a strike may have several "objects". The term used in the statute is *an* object, not *the* object. But that does not necessarily mean that every action by an employer which would aid in alleviating a dispute is an "object" of the strike. Some such acts may be side effects of a strike. As is now well established, mere hopes and expectations do not necessarily constitute objects. To hold otherwise would be to nullify the right to strike, a result clearly not intended by the Congress. So, if the rule of law is that any one of several means of settling a dispute may invalidate an inducement to strike, the rule must be applied in the light of the difference between objects and hopes, effects or expectations. Difficult evaluations of facts and difficult processes of inference arise.

We cannot tell from the Board's decision which, if any, of the above possibilities was the premise adopted by the Board. The question in our minds as we study this record is how and why the Board concluded that cessation of business was an "object" of these work stoppages within the meaning of the Act.

The Union throughout these proceedings has relied on its contract with the Council as a defense to the alleged violations.[5] They say the stoppages were for the sole purpose of enforcing the "clerks' work" clause, which was section B of the agreement. The Union argues that the Board has decided in this case that employees cannot strike to enforce a contract provision preserving to bargaining unit employees the work of the bargaining unit and prohibiting the subcontracting of bargaining unit work. We think the Board has not so decided.

The Supreme Court settled in the Sand Door case, supra, that a contract cannot legalize a strike which would otherwise be illegal under Section 8(b) (4). The question here, then, is whether the employees had a right to enforce their work rights when they had a bargaining agreement respecting the terms and conditions of the work, absent a specific provision respecting subcontracting. It seems clear to us they did have such a right. The tacit but essential premise of a bargaining agreement is that the employer employs the employee to do certain work. When he agrees in good faith to terms and conditions, he represents that if the employees accept and abide those terms they will have this employment. We think employees, even absent a specific anti-subcontracting provision, could enforce their right to the work contemplated by a bargaining agreement.[6] The difficulty with the Union's position is not with its rights under a simple work protection clause. Its trouble is, as we have already emphasized, that it does not have such a simple provision; it has a potent "except" clause in its contract. We do not attempt to determine the precise meaning and scope of the "except" clause; i. e., what as a matter of contract construction the words "such work" mean. It is enough for present purposes that the activities and claims of the Union in the course of the controversy reflect its position that the contract permitted subcontracting of the work here in dispute to an employer who has an agreement with this Union. While the Board is reconsidering upon remand the "cease doing business" point, it should also make clear its conclusions, and the reasons therefor, in respect to the effect of this subcontracting clause on the matter. It cannot do so by blanket pronouncements in respect to subcontracting clauses. These clauses take many forms. Some prohibit subcontracting under any circumstances; some prohibit it unless

---

5. The contract was first raised as an "affirmative defense" in the Union's answer to the Board's complaint.

6. Part I of an interesting study of Subcontracting Clauses in Major Contracts appears at 84 Monthly Labor Rev. 579 (June 1961).

there is sufficient work in the shop to keep shop employees busy; some prohibit it except where the subcontractor maintains a wage scale and working conditions commensurate with those of the employer who is party to the collective agreement. On the face of it, these provisions would seem to be legitimate attempts by the union to protect and preserve the work and standards it has bargained for. In the latter supposition, for example, the union may be attempting to remove the economic incentive for contracting out, and thus to preserve the work for the contracting employees. The contractual provisions involved in the instant case present a difficult problem. The Board should consider the problem posed by these clauses in general and this clause in particular in the light of the Sand Door case, and make clear its conclusions upon this phase of the matter, i. e., clause (A) of Section 8(b) (4).

This case brings into focus the difficulties and complexities of administering this section of the statute. We are dealing with it as it was before the amendments of 1959,[7] but the test "where an object thereof is" remains the same. The meaning of "an object" is indeed nebulous. Balked by the inadequacy of semantic definitions, the Board and the courts have embarked upon the formulation of definitive criteria which will supply usable means of adjusting the right to strike, protected by Section 13 of the Act, and the outlawing by Section 8(b) (4) of inducements to strike for specified objects.[8] Various considerations for this purpose have been suggested and used—distinctions between "primary" and "secondary" employers, employers "in the position of primary employers", the balancing of pressures, the measure-

ment of pressures, the terms and purport of picket signs, the place and circumstances of picketing, and other phases of acute labor disputes. The initial responsibility for these administrative criteria is of course upon the Board, and perhaps it is compelled to proceed upon an *ad hoc* basis. But it should be as clear as possible in its pronouncements, lest the whole matter be mired down in a morass of uncertainties. Upon remand the Board may find this case an opportunity to clarify some phases of this problem.

We repeat that we are unable to discern from the Board's opinion and decision the basis for its conclusion as to the charge of violation of clause (A) of Section 8(b) (4). It found a violation of that clause, but the process of its reasoning and the subsidiary conclusions upon which its final conclusion rested are not discernible.

That portion of the Board's order which adjudged a violation of clause(A) of Section 8(b) (4) of the statute is set aside and the case remanded for further findings and conclusions with a view to clarification of the Board's disposition of the matter.

■ We turn now to the Board's finding that by calling the work stoppages the Union violated clause (B) of Section 8(b) (4), because "an object" thereof was to force U. S. Hardware, the rack-jobbers, to recognize and bargain with the Union when the Union was not the certified representative of U. S. Hardware's employees. The Union attacks this finding solely on the ground that it was not supported by substantial evidence. The Examiner's conclusion was based largely on his finding of fact that on the day following one of the work

---

7. See note 1, supra.

8. In National Labor Relations Board v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951), the Supreme Court said: "In the views of the Board as applied to this case we find conformity with the dual congressional objectives of preserving the right of labor organizations to

bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." And see the discussion in Local 761, International Union of Electrical, Radio and Machine Workers v. N. L. R. B., 366 U.S. 667, 81. S.Ct. 1285, 6 L.Ed. 592 (1961).

stoppages an agent of the Union told the president of U. S. Hardware that the pressure generated by the work stoppage could be relieved if Hardware signed a contract with the Union. This fact was testified to by Hardware's president and was flatly denied by the Union agent. The Board accepted the Examiner's finding and conclusion. The Union argues that, even though the Examiner purported to make this finding by resolving the credibility of the witnesses, it is implausible in view of the fact that it was Hardware which initiated conversations with the Union looking toward a contract. We think the conclusion was supported by substantial evidence. As we have already stated, recognition of the Union by the rack-jobbers was clearly an alternative means of settling the dispute, and this was perfectly clear to the rack-jobbers. The record plainly shows that the Union encouraged the rack-jobbers to get a "release" from the Teamsters so that the delivery employees of the rack-jobbers might join the Retail Clerks. Under the circumstances the testimony of Hardware's president was entirely plausible, and we think it is sufficient to support the conclusion.

In a footnote to its brief the Board makes the following assertion:

> "The only difference between the two violations is the existence of a recognition objective in Section 8(b) (4) (B). All Section 8(b) (4) (B) violations are also Section 8(b) (4) (A) violations."

We think this statement is too broad. We think we can visualize efforts to force recognition of an uncertified bargaining representative, which efforts do not also seek a cessation of business. A union might well seek recognition from another employer but at the same time be most reluctant to see the business cease or even lessen. This case may possibly be an example. A recognition object need not always be implemented by cessation of business. So we think there is no inconsistency in our holding that clause (B) was violated even though clause (A) may not have been violated.

The Union also argues that the Board's cease and desist order is too broad. We agree. We think the portion of the order which we affirm should be modified to correspond to the violations actually found to have been committed.

Affirmed in part as modified; set aside and remanded in part.